[Cite as *In re K.A.*, 2021-Ohio-1772.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                        |   |                              |
|------------------------|---|------------------------------|
|                        |   | JUDGES:                      |
| IN RE: K.A.            | : | Hon. Craig R. Baldwin, P.J.  |
|                        | : | Hon. W. Scott Gwin, J.       |
|                        | : | Hon. Patricia A. Delaney, J. |
|                        | : |                              |
|                        | : |                              |
|                        | : | Case No. 2021 CA 00002       |
|                        | : |                              |
|                        | : |                              |
|                        | : | OPINION                      |

CHARACTER OF PROCEEDING:     Civil appeal from the Fairfield County Court of Common Pleas, Juvenile Division, Case No. 2019 AB 0059

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     May 24, 2021

APPEARANCES:

For: Appellee

R. KYLE WITT
Prosecuting Attorney
By: GENYLYNN COSGROVE
Assistant Prosecuting Attorney
239 West Main Street, Ste 101
Lancaster, OH 43130

For: Father

AMANDA GALLANT
165 E. Livingston Avenue
Columbus, OH 43215

*Gwin, J.*

{¶1} Appellant J.A. appeals the December 17, 2020 judgment entry of the Fairfield County Court of Common Pleas, Juvenile Division, terminating his parental rights and granting permanent custody of K.A. to the Fairfield County Child Protective Services ("FCCPS").

*Facts & Procedural History*

{¶2} J.A. is the father ("Father") of K.A., born on May 9, 2019. A.C. is the mother ("Mother") of the child.

{¶3} On May 16, 2019, FCCPS filed a complaint for abuse and/or dependency with regards to K.A. The complaint alleged, in part: Mother and K.A. tested positive for heroin at the time of K.A.'s birth; Mother has a significant history of using both methamphetamines and opiates; Father has a significant history of substance abuse of both heroin and methamphetamines; Father refused to submit to a random drug screen on May 14, 2019; and Father admitted to the use of methamphetamine and heroin "a couple days ago." K.A. was placed in the temporary custody of FCCPS on May 16, 2019.

{¶4} The trial court found K.A. dependent on August 7, 2019. Neither parent contested the finding of dependency. The trial court granted the agency's motion to extend temporary custody in May of 2020.

{¶5} The trial court originally appointed Natalie Noyes as guardian ad litem in the case in May of 2019. On June 4, 2020, Noyes filed a motion to withdraw as GAL. The trial court granted the motion, and appointed Amanda Morris as the guardian ad litem on June 9, 2020. Noyes filed a report in July of 2019, stating that she attempted to contact both Mother and Father via phone calls and letters, but the phone numbers of both

parents were disconnected and, despite the letters not being returned, neither Mother or Father contacted her.

{¶6} FCCPS filed a motion for permanent custody on August 11, 2020. Paternal grandparents filed a motion for legal custody on August 17, 2020. The trial court set a hearing for December 9, 2020. The GAL filed a report on December 2, 2020, opining that it is in the best interest of K.A. for permanent custody to be granted to FCCPS. The GAL stated she spoke with the foster parents, the paternal grandparents, and caseworkers, but "did not make contact with Father or Mother due to their continued incarceration during my involvement in this matter. However, I have had contact with Mother through my involvement with an older sibling."

{¶7} Father filed a motion to continue the hearing on December 7, 2020 because the GAL did not meet with Father as required by Rule of Superintendence 48. The trial court denied the motion on December 7, 2020, stating "whether or not the Guardian ad Litem fulfilled her duties under Superintendence Rule 48 is not a proper basis for a continuance of a permanent custody hearing. Counsel for Father may cross-examine the Guardian ad Litem as to her investigation into this matter at the hearing. The Court will then give the report the weight it deserves in making the determination as to what is in the best interest of the child."

{¶8} The parties submitted written stipulations prior to the hearing. Both Mother and Father stipulated that K.A. has been in the temporary custody of FCCPS for twelve or more months of a consecutive twenty-two-month period.

{¶9} At the hearing, counsel for Mother indicated he would be taking no position on the motion for permanent custody, as he had not had contact with Mother for an

extended period of time.  During the virtual hearing, Mother called in.  She was permitted to speak with her attorney.  Mother directed her attorney to tell the trial court that she was aware of the hearing and that she did not want to participate in the hearing.

{¶10}  Father testified at the hearing.  Father recalled the case plan somewhat, but testified he did "very little of what was required" of him because he was in "full-blown addiction." He agreed that while he now is trying to take steps on his case plan, for the first year of K.A.'s life, he did not really work the case plan services.

{¶11}  Father started using meth in 2015 and then progressed to heroin.  In 2017, he was convicted of a misdemeanor related to drugs.  He was initially in a treatment facility, but his probation was revoked, and he served time in jail.  When K.A. was born, Father lived at his parents' house, but rarely stayed there.  He stayed at random places. Father testified he did have stable housing at his parents' house, but he "chose not to stay there."  In June of 2020, Father went to jail for possession of heroin.  He was in jail for two-and-a-half months, and then was released to a treatment facility.  He went from the treatment facility to a sober living house in Columbus, where he currently resides.  He is able to stay there for up to a year.  Father testified he is trying to "get on his feet."

{¶12}  Father is not currently working, but worked as a plumber from January 2020 to June of 2020.  Prior to that, he did odd jobs for the last several years.

{¶13}  Father admitted he did not do counseling or assessments outside of his court-ordered treatment program.  Father also admitted his level of participation in the call-in, random drug screening program required by his case plan was "slim to none."  At the time of the hearing, Father testified he had been clean and sober for five months and twelve days.

{¶14} Father had supervised visitation with K.A. From June 30, 2020 to September 10, 2020, he was not able to see K.A. because he was in jail.

{¶15} Father was aware he was not supposed to have contact with Mother because of her probation requirements, but he still had contact with her. Father once went to Mother's location to visit K.A. because FCCPS cut his visit with K.A. short. Father disputed FCCPS' account that he was hiding under clothes in Mother's closet and stated he was just standing in the closet behind some clothes.

{¶16} When asked if he was in a position to have custody of K.A., Father stated, "it's going to take me a month or two to get on my feet," and admitted he is currently not in a position to parent K.A. However, Father believes he will be able to obtain a job and housing and be ready to parent K.A. within six months.

{¶17} Father testified he never had any communication with the GAL. Father did not ask FCCPS to contact the GAL on his behalf, and he stated he didn't "know * * * what my purpose for talking to her would be." Father testified FCCPS always knew how to get ahold of him during the pendency of the case. Father stated K.A. identifies him as "Da."

{¶18} Caitlin Huffstutler ("Huffstutler") was the intake worker for K.A. FCCPS initially became involved with the family because Mother tested positive for heroin and opiates upon her admission to the hospital, and K.A. tested positive for opiates when he was born. Mother initially gave Father's name as a placement for K.A., but Father refused to drug test when he met with Huffstutler and admitted he used heroin and meth several days prior. When Huffstutler picked up K.A. from the hospital, there was a security concern that paternal grandmother may try to pick up the child herself. After K.A. was

released from the hospital, Huffstutler attempted to contact Father, but could not get in touch with him.  The case was then transferred to the ongoing case unit.

{¶19}  Heather Stoneburner ("Stoneburner") of FCCPS was assigned to do an assessment for a potential kinship placement for K.A.  She first did an assessment of K.A.'s paternal grandparents.  Stoneburner had concerns that the paternal grandmother was not taking the drug use concerns seriously.  Stoneburner was concerned about the potential drug use of paternal grandmother.  Paternal grandmother initially agreed to drug test that day, but never showed up to test until six days later.  Stoneburner ultimately denied the kinship assessment.

{¶20}  Jessica Caldwell ("Caldwell") is the parenting time monitor in this case. Father was doing weekly supervised visits.  He was attentive, loving, and patient with K.A. Father did not move up to the next level of visitation because he was not actively engaging in case plan services.  FCCPS generally does not do visits with parents when they are incarcerated when the children are as young as K.A. is.  After he was released from jail, Father was able to do frequent video visits beginning in October of 2020.  Caldwell has not seen anything that caused her concern about the way Father interacts with K.A. during the visits.

{¶21}  Rachel Weygandt ("Weygandt") has been the ongoing caseworker for K.A. since June of 2019.

{¶22}  Father's case plan required him to:  meet monthly with Weygandt, maintain housing, maintain employment, participate in the call-in drug screening program with American Court Services, complete a mental health and substance abuse disorder

assessment and follow all recommendations, and participate in consistent parenting time with K.A.

{¶23} While Father reported he had consistent housing, Weygandt testified his housing throughout the case was with either his parents or his friends. Weygandt never met Father anywhere other than the agency because Father said his friends did not want her at their homes, and because paternal grandmother did not want Weygandt at her home because the agency "just lied about her." Father was in prison and the rehab facility. When he is released from sober living, Father reported to Weygandt that he will live with his parents, unless that causes a problem with the agency, in which case he will live with his friends until he can find his own housing.

{¶24} Father reported to Weygandt that he will not have any trouble obtaining a plumbing job once he is out of the sober living facility. However, Weygandt testified Father told her several times during the pendency of the case he was going to get a plumbing job, but never did.

{¶25} Father completed a mental health assessment in October of 2019, but did not want to participate in the recommended program, so he was dismissed from The Recovery Center in October of 2019. Though Father would talk about getting another assessment at other places for many months to Weygandt, he never did so until he entered a program he was required to complete for his court-ordered treatment. Father did not participate in any substance abuse or mental health treatment until he entered the treatment in lieu of conviction program. Father would not sign a release for Weygandt to be able to speak with his counselor. The counselor did report that Father successfully completed his inpatient treatment.

{¶26} Weygandt testified that Father was not compliant with the call-in drug screening aspect of the case plan. Weygandt and Father would talk about it each month during their visits, but Father never completed a screen. When Father told Weygandt he could not produce a urine screen, she changed the order to an oral swab; however, he never went to screen. Father never completed a screen throughout the entirety of the case. Weygandt does not know if he screens while in treatment because Father would not sign a release to allow her to access those records.

{¶27} At a January 2020 visitation with K.A., Father appeared under the influence and admitted to Weygandt he was using meth and heroin and he had been obtaining Suboxone off the street illegally.

{¶28} Weygandt testified Father was very consistent with visitation.

{¶29} Weygandt stated FCCPS made the following efforts to attempt reunification between K.A. and Father: monthly visits with her to discuss the case plan and any barriers; contacting service providers; encouraging him to engage in case plan services; and completing a kinship assessment for Father's relatives.

{¶30} While Father was consistent in meeting with Weygandt and with his parenting time, he was never consistent with the remainder of his case plan. Substance abuse continued to be an issue for Father throughout the case. Though Father is attempting to remedy the substance abuse issue, this is a fairly new development and he is not consistently there yet. Weygandt testified Father is not currently in a position to be able to care for or parent K.A.

{¶31} K.A. has been placed in the same foster home since several days after his birth and lives with his half-sibling (Mother's first child). Weygandt has observed K.A. in

the foster home on a monthly basis. K.A. is very bonded with both foster parents and his sibling. K.A. is thriving in the foster home. K.A. has been in the temporary custody of the agency since May of 2019.

{¶32} While FCCPS has tried to work to reunify K.A. with Mother and/or Father, that has not come to fruition. Weygandt testified that K.A. deserves to have a home where he can feel safe and allow him to thrive. Neither Mother or Father can currently provide K.A. with a legally secure permanent placement. Thus, Weygandt believes is in the best interest of K.A. to grant permanent custody to FCCPS.

{¶33} When asked on cross-examination whether Father may be able to be compliant with his case plan in four to six months, Weygandt stated she did not know, but Father has told her at each monthly meeting he was going to do case plan services each month, but never did. Weygandt has only seen Father able to maintain his sobriety when he was incarcerated or completing inpatient treatment. Weygandt is very happy Father is completing a treatment program through the court system, but FCCPS encouraged him to participate in recovery services prior to him being incarcerated, and she never saw him do that on his own.

{¶34} Counsel for Father cross-examined the GAL about her report. The GAL was not provided with Father's contact information upon her appointment in June of 2020, so she did not attempt to contact him prior to him being arrested on June 30, 2020. She did not contact Father's attorney to ask for his contact information. The GAL was not aware of Father's actual incarceration dates. The foster parents reported that K.A. does not identify Father or Mother as his parents, but the GAL was unable to independently confirm this.

{¶35}  Based on everything she heard at the hearing, the GAL's opinion has not changed from her report recommending that granting permanent custody to FCCPS is in the best interest of K.A.

{¶36}  The trial court issued a judgment entry on December 17, 2020 granting FCCPS's motion for permanent custody, terminating parental rights of Father, and placing K.A. in the permanent custody of FCCPS.

{¶37}  The trial court found Father was successful in case management participation in portions of his case plan.  However, Father did not successfully obtain and maintain stable housing.  Though he claimed his parents' home as a permanent address, he has chosen to stay with friends.  The trial court noted, "FCCPS was not able to visit Father in his parents' home as Paternal Grandparents would not allow FCCPS into their home, due to the denial of a previous kinship application that was denied for Mother's previous biological child that FCCPS was granted permanent custody of."  Additionally, Father was incarcerated from June to September of 2020, in rehab from September 2020 to December 1, 2020, and entered a sober living housing situation on December 1, 2020 in order to comply with a treatment in lieu of conviction program.

{¶38}  The court determined Father did not successfully maintain employment, and has not successfully completed the treatment for mental health/alcohol/drug concerns, as he demonstrated a pattern of utilizing treatment and remaining sober when incarcerated or in rehab, but did not remain sober when he was not incarcerated or in treatment.  The trial court noted his repeated failures to drug screen for FCCPS.

{¶39}  The trial court found that Father was consistent with his visits, except when he was incarcerated.

**{¶40}** The trial court found FCCPS exerted diligent and reasonable efforts to assist Father in remedying the problems that caused K.A. to be removed from the home, but these services have not prevented the need for removal of the child or enable the child to return safely home. Further, that Father has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home.

**{¶41}** The trial court determined K.A. is bonded with his foster family and his needs are being met in their home. The child has lived with the foster family since he was seven days old, and has continuously resided with them, except for March 20, 2020 through April 15, 2020, when the child was on visit status with Mother.

**{¶42}** When discussing the GAL report, the trial court specifically stated in its judgment entry, "the Court has taken into consideration the concerns of parties as to the investigation of the GAL and gives the GAL report the weight it deserves."

**{¶43}** As to the first prong of permanent custody, the trial court found the parties stipulated K.A. was in the temporary custody of FCCPS for twelve or more months of a consecutive twenty-two-month period, beginning on May 16, 2019 through the filing of the motion for permanent custody on August 11, 2020. Further, that Mother abandoned the child by failing to have contact from July 22, 2020 through October 29, 2020 while she was incarcerated and Father abandoned the child by failing to have contact from June 30, 2020, through October 13, 2020 because he was incarcerated. The court found, by clear and convincing evidence, R.C. 2151.414(B)(1)(b) and (d) applies to both Mother and Father.

**{¶44}** The trial court then went through each of the applicable best interest factors detailed in R.C. 2151.414(D)(1) and found as follows: (a) Father has shown a parental

bond with the child and is appropriate in visits; however, the child has not resided with Father and Father has not been able to demonstrate an ongoing relationship due to his addiction and incarceration; the child is bonded with his foster parents; K.A. resides with his half-sibling; (b) the child is too young to express his wishes; (c) the child has been with the foster parents since May 16, 2019, and was only at Mother's for 25 days during that period; (d) K.A. needs a safe and stable environment where K.A.'s needs are met on a consistent basis; K.A. cannot find a legally secure placement with Father because he does not have stable housing, employment, or a demonstrated capacity to care for the child; though Father believes the child should wait in foster care while he attempts to get back on his feet, the child has already been in the custody of FCCPS for most of his life and there is no guarantee Father will be "on his feet" in a reasonable amount of time, as he has failed to demonstrate stability in the last 18 months; the child has already waited all of his 18 months for Father to be able to care for him and is in need of permanency at this time; no kinship placements were approved, despite being explored by FCCPS; and (e) Father abandoned the child due to his incarceration from June 30, 2020 to October 13, 2020.

{¶45} Utilizing these factors, the trial court found, by clear and convincing evidence, it is in the best interest of K.A. to be committed to the permanent custody of FCCPS. The trial court granted the motion of FCCPS for permanent custody and terminated the parental rights of Father.

{¶46} Father appeals the December 17, 2020 judgment entry of the Fairfield County Court of Common Pleas, Juvenile Division, and assigns the following as error:

**{¶47}** "I. THE GUARDIAN AD LITEM FAILED TO COMPETENTLY PERFORM HER DUTIES PURSUANT TO SUPERINTENDENCE RULE 48. THUS, THE COURT ABUSED ITS DISCRETION IN TAKING HER REPORT INTO EVIDENCE AND ALLOWING HER TO SUBMIT TESTIMONY AND A BEST INTEREST RECOMMENDATION.

**{¶48}** "II. THE TRIAL COURT ERRED IN FINDING THAT IT IS IN THE CHILD'S BEST INTEREST THAT HE BE PLACED IN THE PERMANENT CUSTODY OF FAIRFIELD COUNTY CHILD PROTECTIVE SERVICES, AS THE PROSECUTION FAILED TO MEET ITS BURDEN OF PROOF AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

*Permanent Custody*

**{¶49}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1).

**{¶50}** Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate

court must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶51} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶52} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

{¶53} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶54} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody.  In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.  In this case, the parties stipulated that K.A. has been in the temporary custody of FCCPS for twelve or more months of a consecutive twenty-two-month period.  Additionally, the trial court found Father abandoned K.A. by failing to have contact from June 30, 2020 through October 13, 2020 because he was incarcerated.

I.

{¶55} In his first assignment of error, Father contends the trial court abused its discretion by taking the GAL's report into evidence and allowing her to submit testimony and a best interest determination because the GAL failed to perform her duties under Superintendence Rule 48.  Father argues the GAL did not "observe the child with each parent" and failed to view Father's interactions with K.A.  Father filed a motion to continue the hearing so that the GAL could observe him with K.A.  The trial court denied the motion. Father continues to assert the GAL failed to make adequate contact.

{¶56} Rule 48(D) of the Ohio Rules of Superintendence is a lengthy statement of the basic responsibilities of a GAL serving in an Ohio court, which are to be performed "unless impracticable or inadvisable to do so."  These responsibilities include representing the best interest of the child for whom the GAL is appointed, maintaining independence, objectivity, and fairness, acting as an officer of the court, participating in pertinent hearings, resolving any conflicts of interest that may arise, meeting qualifications and

training requirements, making reasonable efforts to become informed about the case, contacting the parties, maintaining confidentiality, and numerous other considerations.

{¶57} We have recognized that Superintendence Rule 48 is a general guideline that does not have the force of statutory law, and therefore an appellant does not have any substantive right to enforce it. *In the Matter of D.S.*, 5th Dist. Fairfield No. 15 CA 30, 2016-Ohio-79; *Rice v. Rice*, 5th Dist. Delaware No. 10 CAF 11 0091, 2011-Ohio-3099. In general, the Ohio Rules of Superintendence are "purely internal housekeeping rules which do not create substantive rights in individuals or procedural law." *Elson v. Plokhooy*, 3rd Dist. Shelby No. 17-10-24, 2011-Ohio-3009.

{¶58} Moreover, the GAL was present at the evidentiary hearing. K.A. was represented by counsel separate from the GAL. Counsel for Mother, counsel for Father, and counsel for K.A. all had the opportunity to cross-examine the GAL.

{¶59} Additionally, the trial court, as the trier of fact, is permitted to assign weight to the GAL's testimony and recommendation and to consider it in the context of all the evidence before the court. *In the Matter of D.S.*, 5th Dist. Fairfield No. 15 CA 30, 2016-Ohio-79, *In re T.C.*, 6th Dist. Lucas No. L-15-1106, 2015-Ohio-3665, *In re M.Z.*, 9th Dist. Lorain No. 11CA010104, 2012-Ohio-3194. The decision of whether to consider a GAL report, even when the guardian did not fully comply with Superintendence Rule 48, is within a trial court's discretion. See *Corey v. Corey*, 2nd Dist. Greene No. 2013-CA-73, 2014-Ohio-3258.

{¶60} In this case, the trial court specifically addressed the objections made to the GAL report by the parties and stated it "has taken into consideration the concerns of the parties as to the investigation of the GAL and gives the GAL report the weight it deserves."

Additionally, from the trial court's detailed judgment entry, it is clear the decision was not based upon the lack of the GAL's viewing of the interactions between K.A. and Father, as several other witnesses testified Father had positive visits with K.A. The trial court listed numerous other factors taken into consideration for its determination.

{¶61} Upon our review of the record, we find the trial court did not abuse its discretion in its treatment of the testimony and report of the GAL. We have held Superintendence Rule 48 does not create substantive rights and is used for guidance. The trial court specifically addressed the issue and we can find no reversible error, particularly where the trial court has the discretion to follow or reject any recommendation of a GAL. *Wine v. Wine*, 5th Dist. Delaware No. 04 CA F 10, 068, 2005-Ohio-975. Father's first assignment of error is overruled.

II.

{¶62} In his second assignment of error, Father contends the trial court's determination that the best interest of the child would be served by the granting of permanent custody to FCCPS was against the manifest weight and sufficiency of the evidence.

{¶63} Father argues the testimony at trial showed his relationship with K.A. was positive and a bond exists between him and K.A. Further, that his testimony demonstrates he is working on his case plan, and is willing to be a parent.

{¶64} We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy*

*Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), citing *In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

{¶65}  In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child and (4) the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.  No one element is given greater weight or heightened significance.  *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816.

{¶66}  A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.  The willingness of a relative to care for the child does not alter what a court considers in determining permanent custody.  *In re Patterson,* 134 Ohio App.3d 119, 730 N.E.2d 439 (9th Dist. 1999); *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 574 N.E.2d 1055 (1991).  Accordingly, a court is not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody.  *In re R.P. and I.S.*, 5th Dist. Tuscarawas No. 2011AP050024, 2011-Ohio-5378.

{¶67} The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute. *In re Schafer*, 11 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532. *In re Schafer* made it clear that a trial court's statutory duty, when determining whether it is in the best interest of a child to grant permanent custody to an agency, does not include finding by clear and convincing evidence that no suitable relative was available for placement. *Id.* R.C. 2151.414 "requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* at 111.

{¶68} The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315.

{¶69} We find the trial court did not commit error in finding that granting permanent custody to FCCPS was in the best interest of K.A. Weygandt testified it is in the best interest of K.A. for permanent custody to be granted to FCCPS. She believes that permanency needs to be established for K.A. and he deserves to have a home where he can thrive and feel safe. As noted by Weygandt, even though Father has been consistent in meeting with her and with his parenting time, he has not been consistent with the remainder of his case plan, and there are still substance abuse issues with Father. His attempt to remedy the substance abuse issue is a new development and Father lacks

consistency.  K.A. has never lived with Father.  Weygandt testified Father cannot provide a safe and legally secure placement for K.A.

{¶70}  K.A. has been in the same foster home since birth.  It is the same foster home as Mother's first child.  Weygandt testified K.A. is very bonded with both foster parents and his sibling.  K.A. is thriving in the foster home.

{¶71}  Though Father believes he could be compliant with his case plan in several months, Weygandt stated that, throughout the case, Father told her at each monthly meeting he was going to do case plan services, and it never came to fruition.  Weygandt testified that Father has only been able to maintain his sobriety when he was incarcerated or completing inpatient treatment, and not on his own.

{¶72}  We find the trial court properly considered and weighed the factors in R.C. 2151.414(D) and the trial court's conclusion that the granting of permanent custody to FCCPS is in the best interest of the children is supported by competent and credible evidence.  Father's second assignment of error is overruled.

{¶73}  Based on the foregoing, we find the trial court did not abuse its discretion in granting permanent custody of K.A. to FCCPS.

{¶74} Father's assignments of error are overruled and the December 17, 2020 judgment entry of the Fairfield County Court of Common Pleas, Juvenile Division, is affirmed.


By Gwin, J.,

Baldwin, P.J., and

Delaney, J., concur