[Cite as *In re B.T.*, 2022-Ohio-4093.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | No. 21AP-485 |
| B.T., | : | (C.P.C. No. 19JU-6052) |
| [K.M. | : | (ACCELERATED CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on November 17, 2022

**On brief**: *Robert J. McClaren*, for appellee Franklin County Children Services.

**On brief**: *Campbell Law, LLC*, and *April F. Campbell* for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MᶜGRATH, J.

{¶ 1} Appellant, K.M. (hereafter "K.M." or "mother"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting permanent custody of her daughter, B.T., to appellee, Franklin County Children Services ("FCCS" or "agency").

{¶ 2} The following procedural background is taken primarily from the trial court's decision and entry granting the motion for permanent custody. W.T. (hereafter "W.T." or "father") and K.M. are the parents of B.T., born on May 20, 2018. Paternity was established between father and B.T. on the basis of a paternity affidavit.

{¶ 3} B.T. was initially "removed from the custody of her parents * * * by emergency custody order of June 14, 2018, [and] then a temporary custody order * * * of June 15,

2018."  Several subsequent cases "were dismissed and refiled by operation of law because the Court was not able to reach disposition within the ninety-days from filing required by law."  (Sept. 28, 2021 Decision at 4.)

{¶ 4}  The case filings arose out of "an incident when [B.T.], not yet one month old, was * * * admitted to the ICU at Nationwide Children's Hospital on June 13, 2018" and found to "have a skull fracture on both sides, swelling of the brain, and swelling of the scalp. She had been vomiting her formula for three days at home."  The parents "first denied any abuse."  The father "indicated mother slightly hit the infant's head on the bassinet causing a bump."  The parents subsequently "altered their story, indicating that [W.T.] fell while carrying [B.T.] down the stairs."  (Sept. 28, 2021 Decision at 4.)

{¶ 5}  During the prior case filings, "mother had failed to complete random urine screens; missed most of her [American Court Services] tests.  She was however on Suboxone and receiving counseling from Primary One."  (Sept. 28, 2021 Decision at 4-5.) Father "completed a drug/alcohol assessment in January of 2019.  He missed all but two of the 38 drug screens provided.  Both were positive for marijuana."  Both parents completed parenting classes; father "switched jobs several times during the past few months" while mother "was at home with the other two siblings of [B.T.]"  Although mother "had removed [W.T.] from the house, he was still visiting the siblings there.  His address, and whereabouts, however[,] at the time of [the most recent] complaint were unknown."  B.T. "remained in the temporary custody of FCCS since the first filing and was placed with paternal grandparents A.B. and J.B."  (Sept. 28, 2021 Decision at 5.)

{¶ 6}  On May 20, 2019, FCCS filed the complaint in the instant case alleging that B.T. was an abused, neglected, and dependent child.  On May 21, 2019, during a preliminary hearing, a magistrate of the trial court granted FCCS's request for a temporary order of custody ("TOC").  During that hearing, counsel for mother was re-appointed and made an appearance, and the trial court appointed counsel for father.  Abbie Obenour, the appointed guardian ad litem ("GAL"), also made an appearance "along with the prosecutor." (Sept. 28, 2021 Decision at 5.)

{¶ 7}  On August 1, 2019, the GAL filed a report "recommending temporary custody and commitment to the grandparents."  On August 7, 2019, the magistrate conducted an adjudicatory hearing, at which time "the first and second counts of abuse, [and] the neglect

and dependency counts were dismissed at the request of the State." (Sept. 28, 2021 Decision at 5.) On September 16, 2019, the magistrate issued a decision finding B.T. to be an abused child pursuant to R.C. 2151.031(D). The magistrate terminated the TOC and issued an order of temporary court custody ("TCC"). The trial court subsequently filed a judgment entry adopting the magistrate's decision.

{¶ 8} On February 7, 2020, FCCS filed a motion for permanent court commitment ("PCC"), also known as permanent custody, of B.T. On March 6, 2020, the GAL filed a report recommending that the motion for PCC be granted.

{¶ 9} On February 12, 2021, the GAL filed her "final report recommending permanent court custody." On February 18, 2021, the date scheduled for the hearing on the PCC motion, mother could not participate by Zoom because she could not "enable her sound." In addition, the GAL "wished to have the opportunity to observe mother and child at a visit." The trial court "advised mother to contact the [GAL] to arrange a mutually agreeable time for this observation." (Sept. 28, 2021 Decision at 6.) The court continued the matter and set a new hearing date for August 11, 2021.

{¶ 10} On August 5, 2021, the GAL filed a "supplemental report." (Sept. 28, 2021 Decision at 6.) On August 9, 2021, mother filed a motion to exclude the testimony of the GAL. FCCS filed a response in opposition to the motion.

{¶ 11} The trial court conducted the hearing on the PCC motion on August 11 and 12, 2021. At the start of the proceedings, the trial court denied mother's motion to exclude the testimony of the GAL. During the hearing, FCCS presented five witnesses: (1) mother (as on cross-examination); (2) A.B., the paternal step-grandmother; (3) J.B., the paternal grandfather; (4) Abbey Sebert, the FCCS caseworker for the family; and (5) Abbie Obenour, the GAL. Mother presented the testimony of one witness, Angela Look, her friend.

{¶ 12} On September 28, 2021, the trial court filed a decision and entry granting FCCS's motion for permanent custody. In its decision, the trial court found by clear and convincing evidence that B.T. "has been in the custody of [FCCS] for more than 12 out of 22 consecutive months," pursuant to R.C. 2151.414(B)(1)(d), and that permanent custody was in B.T.'s best interest. (Sept. 28, 2021 Decision at 16.) The court therefore ordered B.T. to be committed to the permanent custody of FCCS for purposes of adoption.

{¶ 13} On appeal, mother sets forth the following two assignments of error for this court's review:

> [I.] The lower court reversibly erred with respect to the GAL:
>
> A. by failing to apply and enforce R.C. 2151.218(D) and (I), Sup.R. 48, Juv.R. 4, and Loc.R. 4 with respect to the GAL;
>
> B. by allowing the GAL's testimony as to the child's best interest when it was not competent and should have been excluded as [K.M.]'s counsel requested.
>
> C. by failing to exclude her testimony when the GAL did not conduct at least one interview with [B.T.] where no caregiver or parent was present.
>
> D. By failing to exclude her testimony when the GAL did meet with [B.T.] at least once a month under R.C. 2151.281 and Loc.Rul 4(D).
>
> [II.] The trial court's decision to grant permanent custody to the agency should be reversed for lack of clear and convincing evidence, under the manifest weight standard, as prejudicial error, and a due process violation:
>
> E. The record is devoid of reliable evidence as to [B.T.'s] wishes.
>
> F. The lower court relied on inadmissible hearsay regarding "failed" drug screenings.
>
> G. The record is devoid of evidence that FCCS made diligent efforts to reunify [B.T.] with her mother.

(Sic passim.)

{¶ 14} Under the first assignment of error, mother asserts the trial court erred in failing to comply with R.C. 2151.281(D) and (I), as well as Sup.R. 48, and Loc.Juv.R. 4. Mother further contends the trial court erred in considering testimony by the GAL as to B.T.'s best interest, and by failing to exclude the testimony of the GAL on grounds the GAL (a) filed an untimely report, (b) did not conduct at least one interview with B.T. and a parent, and (c) failed to testify that she met with B.T. at least once a month.

{¶ 15} R.C. 2151.281 "governs the appointment of a GAL," and "requires a juvenile court to 'appoint a guardian ad litem, subject to rules adopted by the supreme court, to

protect the interest of a child in any proceeding * * * held pursuant to [R.C.] 2151.414.' " *In re A.S.*, 10th Dist. No. 21AP-249, 2022-Ohio-1861, ¶ 49, quoting R.C. 2151.281(B)(1).

{¶ 16} R.C. 2151.281(D) delineates a juvenile court's "responsibility regarding the appointment of a GAL," while R.C. 2151.281(I) "governs a GAL's responsibilities and duties." R.C. 2151.281(D) states as follows:

> The court shall require the guardian ad litem to faithfully discharge the guardian ad litem's duties and, upon the guardian ad litem's failure to faithfully discharge the guardian ad litem's duties, shall discharge the guardian ad litem and appoint another guardian ad litem. The court may fix the compensation for the service of the guardian ad litem, which compensation shall be paid from the treasury of the county, subject to rules adopted by the supreme court.

{¶ 17} R.C. 2151.281(I) provides in part as follows:

> The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court.

{¶ 18} This court has observed that "[t]he Ohio Rules of Juvenile Procedure, which were recently amended effective July 1, 2020, provide that a juvenile court 'shall appoint a guardian ad litem to protect the interests of a child * * * in a juvenile court proceeding when * * * [a]ny proceeding involves allegations of abuse, neglect, or dependency, voluntary surrender of permanent custody, or termination of parental rights as soon as possible after the commencement of such proceeding.' " *A.S.*, at ¶ 50, quoting Juv.R. 4(B)(5). Further, "Article IV, Section 5(A)(1) of the Ohio Constitution provides the Supreme Court of Ohio with general superintendence over all the courts in the state." *Id.* at ¶ 51. Thus, "[i]n accordance with this authority, the Supreme Court originated the Rules of Superintendence for the Courts of Ohio, including the courts of common pleas and the divisions thereof." *Id.*, citing Sup.R. 1; *Arlington Bank v. Bee, Inc.*, 10th Dist. No. 10AP-41, 2010-Ohio-6040, ¶ 16; *In re D.E.*, 10th Dist. No. 20AP-83, 2021-Ohio-524, ¶ 72. The Rules of

Superintendence "were recently amended," effective January 1, 2021, and "contain certain specified provisions that apply in domestic relations and juvenile court cases where the court appoints a GAL." *A.S.* at ¶ 51.

{¶ 19} At the time the GAL in the instant case filed her final report and testified, 2021 Sup.R. 48.03(D) was in effect, and that rule provides:

> (D) Duties of the Guardian ad Litem. Unless specifically relieved by the court, the duties of a guardian ad litem shall include, but are not limited to, the following:
>
> (1) Become informed about the facts of the case and contact all relevant persons;
>
> (2) Observe the child with each parent, foster parent, guardian or physical custodian;
>
> (3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;
>
> (4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;
>
> (5) Ascertain the wishes and concerns of the child;
>
> (6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.
>
> (7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;
>
> (8) Review pleadings and other relevant court documents in the case;
>
> (9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;

(10) Request that the court order psychological evaluations, mental health or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;

(11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

{¶ 20} In accordance with the above language "[m]any of the Rules of Superintendence impose a requirement that the GAL meet with, interview, or observe the children." *D.E.* at ¶ 82. Loc.Juv.R. 4 imposes "similar standards" and "duties" as those set forth in the Rules of Superintendence. *Id.*

{¶ 21} As noted, mother contends the GAL failed to discharge statutory duties, as well as duties required under the Rules of Superintendence and the local rules. Mother maintains the trial court erred in failing to exclude the testimony of the GAL on grounds the GAL had yet to observe mother with B.T. during the time the case was pending, and because the GAL failed to testify that she met with B.T. at least one time per month. Mother also contends the testimony should have been excluded because the GAL's report was untimely.

{¶ 22} In response, FCCS argues that, while counsel for mother preserved for review the issue regarding attempts by the GAL to observe a visit with mother and B.T., the remaining arguments were not raised by mother's counsel before the trial court. FCCS further argues the GAL competently carried out her duties and filed a timely report.

{¶ 23} As set forth under the facts, the hearing on the PCC motion was initially scheduled for February 18, 2021. During the start of those proceedings, counsel for mother asserted that "the new [GAL] Rules adopted in December of last year * * * mandates that the Guardian will observe the child with the parent and the caregiver." Counsel for mother represented that "through a combination of [various] things that are not the fault of the [GAL], this has not taken place." (Feb. 18, 2021 Tr. at 5.) Counsel also represented that mother, who was participating in the proceedings via Zoom, "can't hear for whatever reason." (Feb. 18, 2021 Tr. at 6.)

{¶ 24} Based upon the circumstances presented at the time of the hearing, the trial court indicated it would continue the matter. As part of a discussion addressing a new

hearing date, the GAL informed the court she was "going to have a baby sometime in the next three weeks." (Feb. 18, 2021 Tr. at 11.) In response to a scheduling inquiry by the trial court, the GAL stated she would be available in "May, at the earliest." The trial court, upon review of its docket, stated that "my next * * * available hearing would be in August." (Feb. 18, 2021 Tr. at 12.) The court also discussed the issue of the GAL having "the opportunity for you to observe mother and child[]." Abbey Sebert, the FCCS caseworker, informed the court that visits were "scheduled at the agency right now," but that mother "just missed several of them." (Feb. 18, 2021 Tr. at 13.) The trial court, noting that the visits were "scheduled," directed that "mom will have to make it a point to schedule a visit," and the court requested that counsel for mother "help coordinate this." (Feb. 18, 2021 Tr. at 14.)

{¶ 25} With regard to the issue of scheduling a visitation, the GAL made the following request to the trial court:

> I would ask that the Court order the mother or her counsel stay in touch with me about when visits are occurring. Mother's phone number changes often and * * * she'll schedule these visits and then she doesn't show up and this was a problem that I had when I initially investigated this case. I attempted several times, mom wasn't there, and * * * I don't want to play this game. I would really appreciate * * * some kind of * * * communication so that I don't have to spend weeks chasing everybody down and making multiple unsuccessful attempts. I just * * * don't think that's a realistic or fair expectation for anybody, currently.

(Feb. 18, 2021 Tr. at 15.)

{¶ 26} In response to the GAL's request, the trial court directed counsel for mother to "make that clear to mom that she needs to be in touch with the [GAL] when she is going to visit * * * so the [GAL] is not going there on a fool's errand." (Feb. 18, 2021 Tr. at 16.) The trial court therefore continued the matter until August 11, 2021, "in that the [Z]oom hearing failed as to mother's connectivity and also we're continuing it for [the GAL] to observe mother and [B.T.] and that mother connect with the [GAL] to arrange it." (Feb. 18, 2021 Tr. at 20-21.) In a continuance entry filed February 18, 2021, the trial court made a notation directing mother to connect with the GAL.

{¶ 27} At the start of the proceedings on August 11, 2021, counsel for mother objected to the "expected testimony of the [GAL]," asserting that the final report of the GAL was late, and that the GAL had failed to meet with mother and [B.T.] (Aug. 11, 2021 Tr. at 23.) Counsel for mother acknowledged that "admittedly my client was not easy * * * for the [GAL] to contact or see." Counsel further stated that if he could "proffer" the testimony of his client (i.e., mother), it "would be that she tried to meet with the [GAL and] was unable to do it, was unable to arrange a visit. * * * So * * * I understand the circumstances were difficult for the [GAL]." (Feb. 18, 2021 Tr. at 25.) Counsel for FCCS objected to the motion, arguing that "the [GAL] had made diligent efforts to try to observe visitation." (Feb. 18, 2021 Tr. at 28.)

{¶ 28} Regarding the timeliness of the GAL's report, and in response to questioning by the trial court, counsel for mother acknowledged the GAL had filed more than one report. When further questioned by the trial court as to how "the last report" is "different from the report that the [GAL] wrote * * * August 5, 2021," counsel responded: "It probably differs in no material way." (Feb. 18, 2021 Tr. at 27.)

{¶ 29} In considering the merits of mother's argument, the trial court indicated it had reviewed the GAL's reports of February and August 2021 and did not "see that [the GAL] ever changed her mind, * * * it's been the same recommendation basically the whole time." The trial court further observed that "in reading those prior reports, the [GAL] outlined her attempts to contact to visit with the parents at visitations but they were so sporadic in visiting that she could never do that and then she tried later to visit with the parents at the grandparent's home * * * and the same thing happened, she could never schedule a time when the parents were visiting at the grandparent's home * * * so * * * there were attempts made by the [GAL]." (Feb. 18, 2021 Tr. at 29.) The trial court also cited the fact that counsel for mother filed the motion to exclude "two days ago." (Feb. 18, 2021 Tr. at 22.) Noting "[t]here's not been any allegations that the [GAL] didn't fulfill all her other obligations," and that counsel for mother will "have the right to cross examine the [GAL]," the trial court held that "the need of the child for resolution outweighs a last-minute motion for a continuance and I don't believe you've met any standards for asking me to not allow the [GAL] to testify, so I'm overruling the motion." (Feb. 18, 2021 Tr. at 31-32.)

{¶ 30} During the hearing on the PCC motion, the GAL testified as to her efforts to observe B.T., as well as her efforts to observe B.T. with her parents. Specifically, the GAL testified in part as follows:

> I have observed B.T. in her home with [the grandparent caregivers] many times over the course of the last three years. I have attended all hearings here at the Franklin County Juvenile Court concerning [B.T.]. I have communicated with the ongoing caseworker, Abbey Sebert, * * * consistently throughout the last three years. I have attended most but not all case plan review meetings at the agency, those happen about every ninety days. * * * I don't get them all, they don't schedule those with me in advance and sometimes I have conflicts but if I'm available I go or I call. I have * * * attempted to observe [B.T.] with her parents. I did go to [FCCS] at 4017 East Main Street twice in the Fall of 2018 to try to observe a visit and both times the parents did not attend so I was unsuccessful.

(Aug. 12, 2021 Tr. at 78.)

{¶ 31} The GAL also testified regarding the filing of reports, noting that she filed a "preliminary report prior to the pretrial hearing on the agency's PCC motion, and then we have had a trial scheduled and continued several times, * * * and I * * * did file[] a report prior to our first trial date, and then we were continued at that time into February of 2021 and I filed another written report in February of 2021, we were continued again here to our dates in August, and I filed a supplemental report last week prior to our trial date today." (Aug. 12, 2021 Tr. at 79.)

{¶ 32} The GAL further testified more specifically about her efforts to arrange a visit to observe B.T. and mother subsequent to the February 2021 hearing, stating in part as follows:

> So * * * I did request at that time that the Court issue an order that [mother] reach out and * * * proactively communicate with me to let me know when she would be visiting with [B.T.] so that I could come and observe. The Court did in fact issue that written order, it's written on the continuance that was docketed on February 22, 2021. And the reason I asked for that order is because - - and I think the Court has been able to observe this over the last couple of days, scheduling and communication with [mother] has been very chaotic and frustrating and inconsistent so * * * I have tried. I have left voicemails, sometimes I didn't have a phone number. In February of this

year I didn't have a phone number and * * * I asked [counsel for mother] for the phone number and he never responded. There's only so much I can do without * * * the other * * * person I'm supposed to be observing * * * meeting me halfway with respect to communication. You know, I'm not psychic and * * * my failure to observe [B.T.] with her mother as part of my investigation, I really do not feel was a lack of due diligence on my part, I tried - - I tried.

* * *

I called and called. Often what would happen * * * is that * * * a referral would be made to the visitation department at [FCCS] for visits to be scheduled at the agency and then it would take several weeks, if not several months, for the visits to actually be scheduled because of communication issues between [mother] and the visitation department. And then the visit would be scheduled and I sometimes was notified when that happened and sometimes I was not notified when that happened. When I was notified, it would usually tak[e] a couple of weeks before I could actually go, right, because I have other cases * * * on my workload and other commitments so * * * I could never go on like one day notice. And then by the time I would actually be able to go, mother * * * would no longer be attending the visits and she would have her three missed visits and then they would drop off the schedule again and then we would start the process over when she made contact and requested another referral for visitation. So * * * again, * * * without some communication from [mother] to * * * facilitate my attendance at one of her visits, * * * I don't have the ability to just hang out at [FCCS] 24 hours a day and wait for her to come for a visit. * * * I can't do that and I don't think the rule requires me to.

(Aug. 12, 2021 at 83-85.)

{¶ 33} As noted, mother's argument that the trial court should have excluded the testimony of the GAL for failure to observe both mother and child together is premised in part on her contention that the GAL failed to comply with Sup.R. 48(D). This court has consistently noted, however, that "[t]he Rules of Superintendence are internal housekeeping rules that create no substantive individual rights." *In re R.P.*, 10th Dist. No. 20AP-538, 2021-Ohio-4065, ¶ 31, citing *D.E.* at ¶ 77. Further, "[b]ecause Sup.R. 48 is a general guideline that lacks the force of statutory law, noncompliance with Sup.R. 48(D) is not grounds for the automatic exclusion of a [GAL's] report, testimony, or

recommendation." *Id.* Rather, a trial court "may exercise its discretion to consider that evidence." *Id.*

{¶ 34} While mother contends the GAL failed to perform her duty of observing her and B.T., the record supports a finding that the GAL attempted to facilitate such an interaction but was frustrated by mother's unavailability and lack of cooperation. We note the facts of the instant case are distinguishable from this court's recent decision in *A.S.,* in which we held the trial court committed plain error "in not requiring the GAL to faithfully discharge his duties and in not discharging the GAL and appointing a new GAL for failure to faithfully discharge GAL duties, as well as in admitting the GAL's report and testimony." *Id.* at ¶ 75. The record in that case revealed multiple deficiencies by the GAL, including the fact the GAL met only once with the child over a three-year period, that there was "no evidence" to support a finding the GAL had observed the child's interaction with the foster parents, *id.* at ¶ 63, and that it appeared the GAL "was basing his opinion at the permanent custody hearing in part on testimony he heard at the hearing itself." *Id.* at ¶ 70.

{¶ 35} By contrast, in the instant case (as outlined above) the GAL testified as to the duties she performed over the approximately three years of the case, including her "many" observations of B.T. with the caregivers at their home, her attendance at court hearings regarding B.T., communications with the caseworker, her attendance at case plan reviews, and the filing of GAL reports. The GAL also represented in her report that she had interviewed the paternal grandparents, the caseworkers, and both parents. While the GAL acknowledged (in her report of August 5, 2021) that she had been unable to observe a visit with both B.T. and the parents, the GAL outlined her attempts to "observe a visit between [B.T.] and her parents." (Aug. 5, 2021 GAL Report at 2.)

{¶ 36} The GAL also testified as to her attempts to contact mother to set up a visitation whereby the GAL could observe the interaction between B.T. and mother. During the February 2021 hearing, the GAL requested the trial court to order mother to cooperate in setting up a visitation time. The trial court granted a continuance of that hearing "for [the GAL] to observe mother and child," and the court directed that "mother connect with the [GAL] to arrange [a visitation]" (such directive also notated in the trial court's continuance entry). (Feb. 18, 2021 Tr. at 20-21.) At the subsequent (August 2021) hearing

on the PCC motion, the GAL testified that mother did not communicate with her between the February 2021 hearing and the final hearing in August 2021.

{¶ 37} Upon review, the record supports the trial court's findings that the GAL made efforts to observe the parents interact with B.T., but that such efforts were unsuccessful in part due to the lack of visitations attended by the parents and the fact that mother, as acknowledged by her counsel during the trial court proceedings, "was not easy" for the GAL "to contact or see." (Aug. 11, 2021 Tr. at 25.) Ohio courts have held, under similar circumstances, that a GAL's failure to observe a visit between a child and parent is not grounds to exclude testimony by the GAL. *See, e.g., In re R.B.*, 8th Dist. No. 107709, 2019-Ohio-1656, ¶ 38 ("As a result of the inconsistent nature of appellant's visits with the child, we are unable to conclude that the GAL's performance or investigation were deficient based on the GAL's failure to attend a visit between appellant and the child."); *In re K.S.*, 6th Dist. No. L-16-1298, 2017-Ohio-7383, ¶ 56 (no abuse of discretion by trial court in admission of GAL's testimony and recommendation, despite failure of GAL to observe father's interaction with child, where GAL "testified that she tried to observe [father's] interaction with the child by attending [father's] scheduled visitation, but the times that she tried to do this, [father] failed to appear," and where GAL also made attempts to contact father by phone but "was never able to reach him").

{¶ 38} As noted above, Sup.R. 48 does not create "substantive individual rights." *R.P.* at ¶ 31. Further, "the trial court, as the trier of fact, is permitted to assign weight to the GAL's testimony and recommendation and to consider it in the context of all the evidence before the court," and "[t]he decision of whether to consider a GAL report, even when the [GAL] did not fully comply with Superintendence Rule 48, is within a trial court's discretion." *In re K.A.*, 5th Dist. No. 2021 CA 00002, 2021-Ohio-1772, ¶ 59. Here, we find no abuse of discretion by the trial court in its determination the GAL made reasonable efforts to observe B.T.'s interactions with mother, and that the GAL otherwise substantially complied with her duties.

{¶ 39} Mother also contends the trial court erred in its consideration of the recommendation of the GAL where the GAL failed to testify that she visited B.T. on a monthly basis, as required by the local rules. Upon review, we find no error by the trial court.

{¶ 40} During the hearing on the motion for PCC, the GAL testified on direct examination that she had the opportunity to observe B.T. "many times" during her current placement, and that she "observed [B.T.] in her home with [the paternal grandparents] many times over the course of the last three years." (Aug. 12, 2021 Tr. at 78.) The GAL similarly noted in her report that she "observed [B.T.] in the home." (Aug. 5, 2021 GAL Report at 2.) Further, counsel for mother had ample opportunity during the hearing to cross-examine the GAL. However, as noted by FCCS, counsel for appellant did not inquire of the GAL as to the number of times she visited B.T. and/or the nature of those interviews. Under these circumstances, mother has not shown abuse of discretion by the trial court.

{¶ 41} Finally, mother contends the trial court should have excluded the testimony and report of the GAL based on a contention the report was untimely as filed on August 5, 2021, less than seven days prior to the hearing date of August 11, 2021. Counsel for mother raised this issue before the trial court by motion filed August 9, 2021 (two days prior to the re-scheduled August 11, 2021 hearing date on the PCC motion), seeking to exclude the GAL's testimony based on the contention that "Loc.Juv.R. 4(D) requires the GAL to file a final report with the court no less than seven days before the dispositional hearing." (Aug. 9, 2021 Mot. to Exclude Testimony of GAL at 2.) FCCS filed a response in opposition to the motion, asserting the rules "do not require that a supplemental report be submitted seven days prior to trial." (Aug. 10, 2021 FCCS Response at 1.)

{¶ 42} A review of the record indicates the GAL filed an initial report on March 6, 2020, recommending that FCCS's motion for permanent custody be granted. The GAL filed a second report on February 12, 2021 (i.e., prior to the initially scheduled hearing date of February 18, 2021), and she filed a third report on August 5, 2021, six days prior to the re-scheduled hearing date (August 11, 2021) on the motion for PCC; in both of those reports, the GAL similarly recommended the trial court grant FCCS's motion for permanent custody.

{¶ 43} As previously noted, during the start of the proceedings on August 11, 2021, the trial court addressed mother's timeliness argument, inquiring whether counsel agreed the GAL had "done more than one report." Specifically, the trial court inquired about the report filed by the GAL at the time of the initially scheduled hearing date (i.e., in February 2021). Counsel for mother agreed that the GAL had prepared more than one report but

argued "the Rule 48 instruction is that * * * a final report should be filed."  (Aug. 11, 2021 Tr. at 26.)   The trial court then inquired of mother's counsel: "How is the last report different from the report that the [GAL] wrote * * * August 5, 2021?"  Counsel responded: "It probably differs in no material way."  (Aug. 11, 2021 Tr. at 27.)

{¶ 44} Ohio courts, including this court, have addressed "the seven-day filing requirement in Sup.R. 48(F)(1)(c)." *In re S.S.*, 10th Dist. No. 17AP-681, 2018-Ohio-1249, ¶ 13.  Those cases have analyzed this issue in the context of whether the parent was able to "show any prejudice or explain how [the parent] was unable to offer an adequate defense due to the untimely filing," including such considerations as whether the parent " 'had the opportunity to and did cross-examine the GAL,' " and whether the GAL's testimony " 'was consistent with and essentially duplicative of much of the content of the report.' " *Id.*, quoting *In re M.T.*, 12th Dist. No. CA2016-11-100, 2017-Ohio-1334, ¶ 48.  This court has held that "these cases demonstrate * * * it is the testimony and cross-examination of the GAL that actually cures the untimely filing." *Id.* at ¶ 17.

{¶ 45} In the present case, mother "does not explain how [she] suffered prejudice or was unable to offer a defense" because of the filing of the GAL's report six days prior to the hearing.  *M.T.* at ¶ 47.  As noted above, counsel for mother had ample opportunity to cross-examine the GAL during the hearing on the motion for PCC.  As also noted, counsel for mother in fact acknowledged during the hearing that the August 2021 report differed "in no material way" from the February 2021 report.

{¶ 46} Upon review, mother has failed to show abuse of discretion by the trial court in failing to exclude the testimony and/or report of the GAL for failure to fulfill her statutory duties or to comply with the applicable rules.  Accordingly, mother's first assignment of error is not well-taken and is overruled.

{¶ 47} Under the second assignment of error, mother challenges the trial court's judgment granting the motion for PCC as against the manifest weight of the evidence and based on prejudicial error by the trial court.  Mother asserts there was nothing in the record to suggest what the best interests of B.T. were, and further maintains the trial court erred in considering, based on the admission of purported hearsay testimony, evidence as to alleged failed drug screens in finding she failed to comply with her case plan. Mother also contends the record fails to show reasonable efforts to reunify mother and B.T.

{¶ 48} The determination by a trial court in a PCC case " 'will not be reversed on appeal unless it is against the manifest weight of the evidence.' " *In re E.B.,* 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19, quoting *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. In reviewing a judgment of the trial court "granting permanent custody to FCCS under the manifest weight standard, ' "an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " ' " *Id.*, quoting *K.M.* at ¶ 13, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. Further, where " ' " 'the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " ' " *E.B.* at ¶ 19, quoting *K.M.* at ¶ 13, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Thus, " ' "[a]n appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence." ' " *Id.*, quoting *In re M.W.*, 10th Dist. No. 11AP-524, 2011-Ohio-6392, ¶ 20, quoting *In re Siders*, 10th Dist. No. 96APF04-413 (Oct. 29, 1996), citing *In re Brofford*, 83 Ohio App.3d 869, 876-77 (10th Dist.1992).

{¶ 49} Both federal and state courts recognize "[p]arents have a constitutionally protected fundamental interest in the care, custody, and management of their children." *In re M.W.,* 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 13, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Murray*, 52 Ohio St.3d 155, 157 (1990). Those rights, however, "are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child." *M.W.*, 2020-Ohio-5199, at ¶ 13, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). Accordingly, "in certain circumstances, the state may terminate the parental rights of natural parents when it is in the best interest of the child." *Id.*, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000).

{¶ 50} R.C. 2151.414 "governs the termination of parental rights in Ohio." *M.W.*, 2020-Ohio-5199, at ¶ 14, citing *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42. In accordance with R.C. 2151.414(B)(1), "a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the

best interest of the child to grant permanent custody of the child to the agency, and (2) one of the situations set forth in R.C. 2151.414(B)(1)(a) through (e) applies." *Id.*

**{¶ 51}** R.C. 2151.414(B)(1) states in part:

> [T]he court may grant permanent custody of a child to a movant if the court determines at the hearing * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
>
> (a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶ 52}** If a trial court "determines that one of the circumstances in R.C. 2151.414(B)(1) applies, it must then determine whether 'clear and convincing' evidence demonstrates that a grant of permanent custody is in the child's best interest." *In re A.U.*, 10th Dist. No. 20AP-594, 2021-Ohio-2658, ¶ 22, quoting *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1). The standard of "[c]lear and convincing evidence is more than a mere preponderance of the evidence; it concerns that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *M.W.*, 2020-Ohio-5199, at ¶ 14.

**{¶ 53}** Once a juvenile court determines that "one of the circumstances in R.C. 2151.414(B)(1) applies, the court turns to R.C. 2151.414(D) to decide if a grant of permanent custody is in the child's best interest." *In re E.C.*, 10th Dist. No. 18AP-878, 2019-Ohio-3791, ¶ 25. R.C. 2151.414(D)(1) states in part as follows:

> In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
>
> For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶ 54} In the present case, the trial court found the child was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period. On appeal, mother does not appear to challenge that finding. Thus, "because the statutory factor set forth in R.C. 2151.414(B)(1)(d) was established, the court was statutorily authorized to grant FCCS permanent custody of the children if clear and convincing evidence existed that it was in the child's best interest to do so." *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 78. Under Ohio law, the focus with respect to " 'the best interest determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents.' " *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 57, quoting *In re B.B.H.*, 10th Dist. No. 14AP-882, 2015-Ohio-2347, ¶ 20.

{¶ 55} With respect to the first factor under R.C. 2151.414(D)(1)(a), the trial court must consider the "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." In its decision, the trial court considered the child's interaction and interrelationship with the parents and other care providers and made the following findings.

{¶ 56} W.T. "is the legal father of [B.T.]," and "[h]e established paternity by Paternity Affidavit * * * signed May 21, 2018," three days after B.T.'s birth. Shortly after B.T.'s "injuries and removal, he and [B.T.'s] mother separated." The father was observed by the caseworker on "only two visits occurring at the agency in December 2018 and March 2019." During those visits, while father "did interact with [B.T.], only mother helped and cared for [B.T.] despite father's completion of parenting classes." B.T. "appeared comfortable with father who acted appropriately at the visits." (Sept. 28, 2021 Decision at 9.)

{¶ 57} The GAL "attempted to observe two visits in 2018, but the parents failed to attend." Father's "last visit at the agency was April 19, 2019." The paternal grandparents "also set up visits with the parents in 2019 either in the kinship home or in the community." However, "after April 19, 2019," father "ceased visits" and "[t]he grandparents, mother, agency, and [B.T.] had no further contact with him." W.T.'s "whereabouts have been

unknown ever since." Finding "no evidence of a parent/child bond," the trial court concluded father "has abandoned" B.T.  (Sept. 28, 2021 Decision at 9.)

{¶ 58} Mother, K.M., "has more of a bond with [B.T.] than her father."  B.T. "comes to her easily."  Mother "has helped care for [B.T.] when she visits," and she has "supplied clothing and gifts to [B.T.] at Christmas."  Mother "completed parenting classes in March 2019," but her psychological evaluation "recommended more classes which have just been rescheduled by mother for this month."  (Sept. 28, 2021 Decision at 9.)   The grandmother "observed and criticized the way mother fed [B.T.]," which resulted in B.T. "almost falling from her highchair."  (Sept. 28, 2021 Decision at 9-10.)   Kinship visits with mother "often ended in bitter words and arguments, which led the agency to reschedule them back to supervised visits."  (Sept. 28, 2021 Decision at 10.)

{¶ 59} Mother's visits with B.T. during the course of the proceedings "have been sparse."  In 2018, mother "admits she attended only ten visits at the agency," and in 2019 "she admits she attended only five visits."  Mother made "virtual visits" during "Covid restrictions."  In 2021, "only two visits were scheduled by [mother] at the agency."  Mother "did not show for the second visit," and therefore "only one visit was made in 2021."  The trial court concluded that "[s]eventeen visits over a three-year period does little to reinforce the parent/child bond."  (Sept. 28, 2021 Decision at 10.)

{¶ 60} The trial court also considered B.T.'s interaction with A.B. and J.B., her paternal grandparents (and current caregivers). With respect to the "paternal grandparent's home," the court found B.T. "has a regular routine.  She has walking braces she uses eight hours a day."   B.T. "is enrolled in daycare and has been enrolled in Franklin County MRDD for over a year.  She is on a waiting list for speech therapy and may again have occupational and physical therapy when and if she needs them." The paternal grandparents "do exercises with [B.T.] to teach her colors, shapes, and counting," and "[t]hey use software on a tablet to teach her the alphabet."  B.T. "can now count to 15," and she "plays games on the tablet to help with her eye/hand coordination."   A.B. and J.B. are working with B.T. on her "ability to dress herself and to use words in sentences."   B.T. "is still in potty training [and] [h]er concentration level remains low."  (Sept. 28, 2021 Decision at 10.)

{¶ 61} The trial court noted the grandparents schedule the medical appointments for B.T., and the grandfather "transports her to them as grandmother is currently in a wheelchair recovering from back surgery." When needed, an aunt, "who has a bond" with B.T., helps the grandparents. Both grandparents assist B.T. with "dressing, feeding, bathing and otherwise caring for her." (Sept. 28, 2021 Decision at 10.) B.T. "has been tested for autism"; she is "on the autism spectrum and is still developmentally delayed." (Sept. 28, 2021 Decision at 10-11.) B.T. "still has a brain shunt and eye issues," but her "seizures have stopped." B.T. "still sees a neurologist." B.T. "goes to her grandparents for support, affection and all of her needs." The grandparents "also care for a developmentally delayed adult son of grandfather" in their home. (Sept. 28, 2021 Decision at 11.)

{¶ 62} The GAL, who "observed [B.T.] with A.B. and J.B.," described B.T. as "[a] sweet, affectionate child, [who] enjoys sitting on their laps." The GAL "observed their care of her, including issues with her helmet." The GAL also "observed J.B. play with her and the grandparents being very attentive to her." B.T. "is observed to be very bonded with both and especially to J.B." A.B. and J.B. "wish to adopt [B.T.]" (Sept. 28, 2021 Decision at 11.)

{¶ 63} A review of the record supports the trial court's findings under the first statutory factor. While the trial court recognized a bond between mother and B.T., and that mother behaved appropriately during visits, the court cited testimony regarding a strong bond between B.T. and her grandparent caregivers. As indicated above, the court heard the testimony of both grandparents regarding their care of B.T. A.B., the paternal step-grandmother, testified that B.T. has been in their home for "about three years and two months." (Aug. 11, 2021 Tr. at 95.) A.B. testified that she and her husband, J.B., would "[m]ost definitely" be interested in adopting B.T. (Aug. 11, 2021 Tr. at 103.)

{¶ 64} J.B., the paternal grandfather of B.T., testified that his bond with B.T. is "really good." He stated there "isn't [anything] I wouldn't do for her, and I'm trying to get her to where she needs to be so she can have a peaceful life." (Aug. 11, 2021 Tr. at 129.) He related that B.T. looks to "[m]e and her grandma" for comfort. (Aug. 11, 2021 Tr. at 130.)

{¶ 65} Abbey Sebert, the caseworker, who has observed B.T. with her caregivers, testified that B.T. is "very bonded" to J.B. and A.B. She stated that "[e]ven when [J.B.] leaves, she gets upset [because] she wants to go with him to work. They're very close and * * * she's very bonded to both grandmother and grandfather." Sebert has not observed

B.T. together with her two siblings "to say whether there's a * * * bond or not." It has been "several years" since father has had contact with B.T. (Aug. 11, 2021 Tr. at 34.) Sebert stated that mother " was always appropriate * * * during visits and I would say [B.T.] was bonded to her." (Aug. 11, 2021 Tr. at 36.)

{¶ 66} As set forth in the above findings, the trial court also considered the issue of visitation history and its effect on the parent-child bonding process. This court has noted that "resolution of [the R.C. 2151.414(D)(1)(a) factor] is not limited to merely the bond between child and parent." *K.R.* at ¶ 81. In this respect, "[c]ourts have considered the consistency of a party's visitation with a child when resolving the R.C. 2151.414(D)(1)(a) factor." *Id.* at ¶ 82.

{¶ 67} The caseworker (Sebert) provided testimony during the hearing as to the parents' visitation history. Sebert stated the last time father saw B.T. was on April 10, 2019, "his last visit." (Aug. 11, 2021 Tr. at 159.) When B.T. first came into FCCS's custody in June 2018, the visitation department set up a schedule. In 2018, the parents "seemed to visit rather often," but "it then started to become very inconsistent." The inconsistency in visits began in Fall 2018. Sebert testified that, "between October and November" 2018, "they were missing enough that they had been removed from the schedule." (Aug. 12, 2021 Tr. at 5.) According to Sebert, "after three missed visits they are removed from the schedule and then * * * if parents request visitation a new referral is then made to have them rescheduled." Over the span of the case, Sebert put in referrals "[f]ive times." (Aug. 12, 2021 Tr. at 14.) After October 2020, mother "was very inconsistent" with visitation and "[t]hey were removed from the schedule due to * * * the three missed visits and then I placed a new referral in February of 2021." (Aug. 12, 2021 Tr. at 24.)

{¶ 68} After February 2021, mother was "[a]gain * * * inconsistent in visits and they were removed from the schedule due to missed visits." In 2021, mother "only attended two visits total, and * * * kinship did cancel two visits also." (Aug. 12, 2021 Tr. at 25.) Mother attended one visitation in January 2021 and one in May 2021. The reasons mother gave for missed visitations were work and transportation issues. Sebert testified that mother has "had her own transportation * * * on and off," but when she did not have transportation available and requested a bus pass, "she would get one" from FCCS. (Aug. 12, 2021 Tr. at 32.)

{¶ 69} During the PCC hearing, mother was also questioned, as on cross-examination, regarding her visitation history. Mother acknowledged visits were initially set up with FCCS, and then at the caregivers, "but then we got in an argument and they wouldn't let me come over there anymore." (Aug. 11, 2021 Tr. at 58-59.) In 2018, mother attended approximately ten visits at FCCS; in 2019, she attended five visits at FCCS. Mother stated "it's just been a mess with the visits. Like, sometimes I'll be notified of a visit afterwards and then other times I have missed, * * * I have. * * * I'm not perfect, I would never say that to anybody." (Aug. 11, 2021 Tr. at 59-60.) When asked whether FCCS had reached out to her in June 2020 to schedule visits, mother responded: "I don't recall that, but probably yes." She agreed that, in 2021, she had "about two visits" with B.T. (Aug. 11, 2021 Tr. at 61.) Mother acknowledged that, during the course of the case, she had approximately 18 visits with B.T. at FCCS, and that she had gone more than 90 days without any contact with B.T.

{¶ 70} Here, the record supports the trial court's findings that mother, while acting appropriately with B.T., often missed scheduled visitations, and that mother's visitation history did "little to reinforce the parent/child bond." (Sept. 28, 2021 Decision at 10.) The trial court also recognized that B.T. thrived in the care of her paternal grandparents, and that her needs were met by their care, and such findings are not against the weight of the evidence.

{¶ 71} Under the second best-interest factor, R.C. 2151.414(D)(1)(b), the court is to consider the "wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." Ohio courts have recognized that "[t]his section 'unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem.' " *R.P.* at ¶ 48, quoting *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 55.

{¶ 72} With respect to this factor, the trial court cited testimony by the GAL that B.T., "who is now 3 years old, is too young and developmentally immature to express her wishes or to understand permanent placement concepts." The trial court further noted the GAL "recommends * * * the Court grant the motion for permanent custody." (Sept. 28, 2021 Decision at 11.)

{¶ 73} Mother argues on appeal that the record was lacking as to the best wishes of B.T. According to mother, there was no evidence the GAL interviewed B.T. "or even could describe what [her] best wishes were." (Mother's Brief at 24.)

{¶ 74} This court has held "[w]hen the evidence demonstrates that a child is not capable or competent to communicate his or her wishes, a trial court is not required to assess the wishes of that child in determining whether permanent custody is in the child's best interest." *In re J.H.*, 10th Dist. No. 19AP-517, 2021-Ohio-807, ¶ 42. Rather, a juvenile court " 'properly considers the GAL's recommendation on the permanent-custody motion as part of the R.C. 2151.414(D)(1)(b) analysis where the children are too young to express their wishes.' " *In re J.A.*, 8th Dist. No. 111029, 2022-Ohio-1324, ¶ 30, quoting *In re B/K Children*, 1st Dist. No. C-190681, 2020-Ohio-1095, ¶ 45. *See also R.P.* at ¶ 51 (trial court did not err in relying on GAL's testimony in considering R.C. 2151.414(D)(1)(b) factor where evidence "is that the children's immaturity—not any deficiency on the guardian ad litem's part—precluded the children from expressing their wishes").

{¶ 75} In the present case, the GAL testified that B.T. was not capable of expressing her wishes. The GAL explained that B.T. "is three years old, she does have some verbal development. She does speak but she does not have either the verbal capabilities to * * * express her feelings or emotions with respect to placement, nor does she have the cognitive development * * * to understand what placement options are available to her and why. She's * * * too young and the development is just not there for her to understand or express her wishes." (Aug. 12, 2021 Tr. at 79-80.) Citing in part B.T.'s "intense medical and developmental needs," the GAL testified that permanent custody was in her best interest. (Aug. 12, 2021 Tr. at 87.) Here, competent, credible evidence supports the trial court's determination that B.T., based on age and cognitive difficulties, was too young and developmentally immature to express her wishes. Thus, the trial court did not err in failing to consider the wishes of B.T. or in relying on the testimony of the GAL as to the best wishes of her.

{¶ 76} In accordance with R.C. 2151.414(D)(1)(c), a trial court is to consider the "custodial history of the child." In its decision, the trial court made the following findings with respect to this factor:

> [B.T.] was removed from her home by Emergency Care Order of June 14, 2018 in prior case no. 18JU-06-7217. The

> temporary custody order in that case was granted on June 15, 2018. She has remained in the temporary custody of FCCS since that date. Sixty days after the first temporary order of custody is August 14, 2018, earlier than the adjudication of August 7, 2019.
>
> From August 14, 2018 to the filing of the Motion for Permanent Custody on February 7, 2020, [B.T.] has been in the temporary custody of [FCCS] for one year, five months and 24 days, more than twelve of a consecutive twenty-two months.

(Sept. 28, 2021 Decision at 11-12.)

**{¶ 77}** The record supports the trial court's findings as to this factor (and mother does not dispute those findings). Further, "[t]his factor favors granting permanent custody to FCCS." *In re J.R.*, 10th Dist. No. 17AP-698, 2018-Ohio-1474, ¶ 44.

**{¶ 78}** Under R.C. 2151.414(D)(1)(d), a trial court is required to consider the child's "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." With respect to this factor, the trial court made the following findings.

**{¶ 79}** B.T. has been in the temporary custody of FCCS "since June 15, 2018, when she was less than one month old," and "[s]he is in great need of a legally secure permanent placement." (Sept. 28, 2021 Decision at 12.)

**{¶ 80}** Father, W.T., "did establish paternity of [B.T.]," and he "completed a parenting class in March 2019." He also completed an "AOD [alcohol and other drug] assessment in January 2019," but the "remainder of his case plan was not substantially completed." Father "never followed any recommendations of his alcohol/drug assessment"; he "completed only two drug screens, each of which was positive for marijuana," and he "missed 108 screens." He "never completed his required psychological assessment," failed to verify "any employment" or income, nor did he verify "stable and safe housing." Father also "did not meet regularly with his caseworker," nor did he attend medical appointments of B.T. (Sept. 28, 2021 Decision at 12.) Regarding visitations with B.T., father "visited inconsistently together with mother and [B.T.]'s siblings." (Sept. 28, 2021 Decision at 12-13.) His last visit "was on April 10, 2019," and since that time "he has not been in contact with the caseworker, his parents who are the caretakers of [B.T.], or

[B.T.]."  He also is "the father of [C.T.] who was recently removed from mother's home with another child."  Father "has abandoned [B.T.]."  (Sept. 28, 2021 Decision at 13.)

{¶ 81}  Mother, "despite several discussions with the caseworker about her case plan, and in receipt of physical copies of her plan on multiple occasions," has not "achieve[ed] substantial compliance" regarding the case plan.  Mother "did sign releases of information for the agency" and "did maintain housing until 2020," initially with W.T. for "about a year," and "then at her mother's home for six months before it was foreclosed."  She then "lived in a homeless shelter for five months."  Mother "now has her own apartment and has lived there for four to five months"; the caseworker "testified the two-bedroom apartment is appropriate for [B.T.]."  She "also did maintain regular contact with the caseworker."  Mother has "two other children."  One of those children "had school attendance problems"; the other child "is a special needs child suffering from epileptic seizures" and, while in mother's care, "missed several medical appointments."  Those two children "are now also in the temporary custody of [FCCS]," and mother "testified she does not know why they were removed."  (Sept. 28, 2021 Decision at 13.)

{¶ 82}  While mother "told [the] caseworker and testified that she was employed and most probably will be obtaining a new position, she had never proven that she is or has income by providing pay stubs to the caseworker."  Mother "completed a parenting class in March 2019" but "has yet to follow through with the second class recommended by her psychological examination"; that "new class begins after this trial."  She also "failed to complete a component of the psychological examination." (Sept. 28, 2021 Decision at 14.)

{¶ 83}  While aware of the fact B.T. "has needed cognitive and developmental therapy," mother "has no idea what medications [B.T.] takes or has taken, no idea of the identity of [B.T.'s] doctors and has attended zero medical or clinical appointments for [B.T.], despite being given advanced notice for three year[s] of these appointments."  The trial court found that "[o]nly this year's blocked attempt of mother to attend Nationwide Children's Hospital is excusable." (Sept. 28, 2021 Decision at 14.)

{¶ 84}  Mother "admits her visits were few and inconsistent, but places blame on the caregivers, who have cancelled only three visits in three years according to the caseworker's testimony."  Mother's plan for B.T.'s medical care "is to do whatever is needed (of which

she is not aware because she testified she was never told anything)," and she "plans to transport [B.T.] by car or bus whichever is available."  (Sept. 28, 2021 Decision at 14.)

{¶ 85} Although mother has had "some counseling for her diagnosis of anxiety and depression, after missing two appointments at the Forum in the summer of 2020, she wishes to change her current counselor whom she has not seen in two months despite her probation requirements for Theft, a felony of the third degree in Judgment Entry [filed] on April 15, 2021, entered after a capias had been issued for her failure to appear at trial." (Sept. 28, 2021 Decision at 14-15.)   Mother "appears to possibly be in further criminal jeopardy as she is the subject of [a court order of May 25, 2021] in the Franklin County Municipal Court * * * for failure to appear for pretrial in that Court."  (Sept. 28, 2021 Decision at 15.)

{¶ 86} Mother "has not substantially completed her substance abuse portion of the case plan."  She has received a prescription for Suboxone by her family physician for "approximately four years * * * for her past abuse of opiates."  Mother testified she "is also, through her doctor, obtaining a medical marijuana card in two weeks."  She testified that "she sometimes attends AA or NA meetings."  Mother "claims she drops every three months for probation on her theft conviction and her probation officer knows nothing about any outstanding warrants (for a different case)."  Out of the "157 scheduled random drug screens under her case plan, mother has completed only 29"; in 2021, several of the screens "were positive for Suboxone and THC," and another screen in 2021 "was positive for alcohol."  Mother's "excuses for failing to test were work schedules, transportation and Covid," but "alternative scheduling after March of 2020 was available once a week."  In 2020, mother "only performed six drug screens for the year." (Sept. 28, 2021 Decision at 15.)

{¶ 87} The trial court found mother "has not remedied the causes for removal nor substantially completed the objectives of her case plan to warrant the return of [B.T.] to her custody."   While mother's only witness testified she was a good mother to her two sons, "the witness never met [B.T.], nor has she seen [B.T.] and mother together." (Sept. 28, 2021 Decision at 15.)

{¶ 88} The only relative of B.T. "approached as a possible custody alternative, besides the paternal grandparents[,] was the maternal grandmother who was advised by

the agency that she could request a home study and file a motion for custody"; she "did not follow through," and "[n]o other relatives have been named as potential custodians[,] nor have any come forward to seek legal custody."  (Sept. 28, 2021 Decision at 16.)

{¶ 89} A.B. and J.B., the paternal grandparents, "have been the acting parents of [B.T.] since one month after her birth."   The paternal grandparents "love and care for her daily and completely," and "[t]hey have missed no medical appointments and have been proactive in obtaining medical, educational and developmental care for her." B.T. is "completely integrated into this family and thriving in their care," and A.B. and J.B. "wish to adopt [B.T.]."  (Sept. 28, 2021 Decision at 16.)

{¶ 90} Based on the evidence presented, the trial court determined B.T. "is in great need of a legally secure permanent placement to continue her development physically, educationally, emotionally and socially."   The trial court concluded "[t]his cannot be achieved without a grant of permanent custody to the agency."  (Sept. 28, 2021 Decision at 16.)

{¶ 91} Mother's primary challenge to the trial court's findings under this factor involves the court's discussion of failed drug screens.  According to mother, the trial court relied on inadmissible hearsay to find she failed to comply with her case plan.  Mother points to testimony by the caseworker regarding failed drug screens, and argues that "no drug screens were introduced at this trial." (Mother's Brief at 23.)

{¶ 92} In response, FCCS notes that counsel for mother did not object to any evidence at the hearing regarding drug screens.  FCCS further notes that, while there was testimony by the caseworker as to positive drug screens for Suboxone and marijuana, mother herself testified she had taken Suboxone for four years and had used marijuana for two months.

{¶ 93} A review of the record indicates that Sebert (i.e., the caseworker) testified that mother, as part of her case plan, was required to complete random drug screens.  According to Sebert, mother was "[n]ot very compliant with completing screens. She's been scheduled for 157 screens and she's completed 29."  When asked what mother had disclosed to her about those tests, Sebert responded: "Typically, she was always positive for Suboxone only. She did have two negative drug[] screens, at one point, when she was in Suboxone therapy, and then in 2021, recently, she's had several drug screens that have included THC as well."

(Aug. 11, 2021 Tr. at 174.) Sebert further related that "[m]om always reported that she plans to get a medical marijuana card and she was working on that with her counselor through Primary One, but she's never, to my knowledge, gotten that and then she had denied the alcohol use on a screen from May of 2021." (Aug. 11, 2021 Tr. at 174-75.) As noted by FCCS, counsel for mother raised no objection to this testimony.

{¶ 94} The record further indicates that, prior to the above testimony by Sebert, mother was called as a witness by FCCS as on cross-examination. Counsel for FCCS questioned mother about providing drug screens, and mother testified: "I take Suboxone." (Aug. 11, 2021 Tr. at 81.) Mother explained that she had a prescription for that drug, and that she had "been on Suboxone for a long time." (Aug. 11, 2021 Tr. at 83.) Mother further testified: "The only thing that would potentially show up that I'm not prescribed yet is marijuana and I will have my medical card within the next two weeks for that." (Aug. 11, 2021 Tr. at 82.)

{¶ 95} Having failed to object to the testimony on this issue, mother "has waived all but plain error." *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 37. The plain error doctrine "is limited to exceptionally rare cases in which the error, left unobjected to at the trial court, 'rises to the level of challenging the legitimacy of the underlying judicial process itself.' " *Id.* at ¶ 38, quoting *Goldfuss v. Davidson,* 79 Ohio St.3d 116, 122 (1997). Stated otherwise, "the plain error rule should not be invoked unless, but for the error, the outcome of the trial would clearly have been otherwise." *Id.*, citing *State v. Cooperrider,* 4 Ohio St.3d 226, 227 (1983).

{¶ 96} Here, even assuming the complained of testimony by the caseworker was hearsay, any error in its admission did not rise to the level of plain error as mother herself testified as to her use of Suboxone and marijuana. Further, we agree with FCCS that the drug screen evidence was not a significant part of the trial court's decision. *See, e.g.*, *In re T.V.*, 10th Dist. No. 04AP-1159, 2005-Ohio-4280, ¶ 58 (where caseworker's testimony about positive drug screens was not a significant factor in trial court's decision granting permanent custody to FCCS, "we cannot say * * * that the outcome would have been different if the court had excluded the testimony"). *See also In re A.E.*, 10th Dist. No. 19AP-782, 2021-Ohio-488, ¶ 57-58 (where purported hearsay testimony regarding drug screens were given "minimal consideration in reaching the custody determination," the record and

decision of juvenile court "forecloses a reasonable probability that the results of the custody hearing would have been different" had mother's counsel objected to the positive screening results).

{¶ 97} Mother also contends the record fails to show reasonable efforts by FCCS to reunify mother with B.T. We disagree.

{¶ 98} As noted by FCCS, it filed its motion requesting permanent custody under R.C. 2151.413, and the trial court "heard the matter pursuant to R.C. 2151.414, thereby eliminating the requirement to prove 'reasonable efforts' as set forth in R.C. 2151.419 at the permanent custody hearing." *In re J.C.*, 10th Dist. No. 10AP-766, 2011-Ohio-715, ¶ 20. In this respect, the Supreme Court of Ohio has held that the provisions of R.C. 2151.419 " 'involve adjudicatory, emergency, detention, and temporary disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state.' " *Id*. at ¶ 17, quoting *C.F*. at ¶ 41.

{¶ 99} In the present case, the trial court, prior to the hearing on permanent custody, made a finding that FCCS "made reasonable efforts to prevent the continued removal of the child(ren) from the home and that those efforts failed to prevent the continued removal of the child(ren) from the home." (May 21, 2019 Mag.'s Findings of Fact and Conclusions of Law.)

{¶ 100} In addition, the trial court's decision granting the motion for PCC included findings that FCCS "made reasonable efforts to prevent or eliminate the need for removal of said child from the child's own home." (Sept. 28, 2021 Decision at 17.) During the hearing, the trial court heard testimony by the caseworker as to her discussions with mother regarding the case plan, FCCS's referrals and scheduling of services for mental health and alcohol and other drug ("AOD") treatment, as well as providing transportation assistance. The caseworker also testified as to efforts to assist mother with dates and times of medical appointments. Based on the evidence presented, the trial court cited the fact that mother, despite "discussions with the caseworker about her case plan," failed to achieve substantial compliance. (Sept. 28, 2021 Decision at 13.)

{¶ 101} Here, the record supports a determination that FCCS made "reasonable efforts to assist mother" in linking her to services "necessary to complete [her] case plan[]." *In re D.K.*, 10th Dist. No. 19AP-801, 2020-Ohio-5251, ¶ 26 (findings that father failed to

complete AOD recommendations (preventing him from moving forward with case plan), and that caseworker made reasonable efforts in linking parents for services necessary to complete case plans, satisfy statutory "reasonable efforts finding requirement").

{¶ 102} Mother does not otherwise specifically challenge the findings of the trial court under R.C. 2151.414(D)(1)(d). The hearing evidence before the trial court included the testimony of the GAL who expressed her concerns as to the ability of mother "to meet [B.T.'s] medical and developmental needs." (Aug. 12, 2021 Tr. at 85.) Citing B.T.'s intense medical and developmental needs, as well as barriers mother has faced in attending medical appointments, the GAL testified that "[f]rom a best interest perspective * * * I don't * * * necessarily care too much what the reason was that mom could not make it to those appointments. [B.T.] needs this care * * * period." (Aug. 12, 2021 Tr. at 87-88.) The GAL further testified: "I do believe that permanent custody to [FCCS] is in [B.T.'s] best interest. * * * She is absolutely in need of a permanent legal placement and I have not seen unfortunately from [mother] what I would need to see to feel confident that she could meet [B.T.'s] intense medical and developmental needs should custody return to her." (Aug. 12, 2021 Tr. at 89-90.) The caseworker (Sebert) similarly testified that B.T. was in need of legally secure permanent placement.

{¶ 103} As set forth above, in addressing the best-interest factor under R.C. 2151.414(D)(1)(d), the trial court noted the length of time B.T. had been under the supervision of FCCS, mother's failure to substantially comply with various aspects of her case plan (including drug treatment and mental health counseling), the inconsistent and sporadic visitation history of mother, missed medical appointments relating to B.T., mother's lack of understanding regarding B.T.'s medications and physicians despite B.T.'s high medical needs, and the significant progress B.T. has made while in the care of her paternal grandparents. On review, the testimony and evidence presented supports the trial court's findings as to this factor.

{¶ 104} With respect to R.C. 2151.414(D)(1)(e) (i.e., whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and child), the trial court found "that father, [W.T.] by his absence since April 19, 2019, with no further contact with [B.T.], has abandoned her." (Sept. 28, 2021 Decision at 16.) The court found that the factor (E)(10) applies. Mother does not challenge this finding.

{¶ 105} The record in this case indicates the trial court reviewed the relevant factors under R.C. 2151.414(D)(1) and weighed the evidence in considering whether the grant of permanent custody to FCCS was in the best interest of the child. Based upon this court's review of the record, there was competent, credible evidence to support the trial court's finding, by clear and convincing evidence, that granting permanent custody to FCCS was in the child's best interest. Accordingly, the trial court's determination was not against the manifest weight of the evidence. Mother's second assignment of error is not well-taken and is overruled.

{¶ 106} Based upon the foregoing, mother's two assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

DORRIAN and MENTEL, JJ., concur.

_____