[Cite as *In re K.S.*, 2023-Ohio-1721.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 22AP-177 |
| K.S. | : | (C.P.C. No. 19JU-12798) |
| (J.S., | : | (REGULAR CALENDAR) |
| Appellant). | : | |
| In the Matter of: | : | No. 22AP-201 |
| | | (C.P.C. No. 19JU-12798) |
| K.S. | : | |
| | | (REGULAR CALENDAR) |
| (D.S., | : | |
| Appellant). | : | |

D E C I S I O N

Rendered on May 23, 2023

**On brief:** *William T. Cramer*, for appellant J.S.

**On brief:** *L. Scott Petroff*, for appellant D.S.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, J.

{¶ 1} Appellant J.S., mother of K.S., and appellant D.S., father of K.S., appeal from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion for permanent custody filed by appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm the judgment of the trial court.

**I. Factual and Procedural Background**

{¶ 2}   In early November of 2019, FCCS filed a complaint alleging that K.S. was a neglected and dependent child.  (Nov. 4, 2019 Compl. at 1.)  FCCS alleged that her "family was homeless" and that she "was not enrolled in school" as of September 11, 2019.  *Id.*  J.S. enrolled her daughter in school on September 13, 2019 but FCCS alleged that K.S. "continued to either miss full days of school, be late, or leave early," impacting her grades. *Id.*  FCCS also expressed "concerns regarding substance abuse" based on allegations that J.S. had tested positive for methamphetamines and received a prescription for suboxone, but subsequently failed to complete a promised drug screen and "gave conflicting information regarding [the] dates of her last use and treatment."  *Id.*  In two counts, FCCS alleged that K.S. was a neglected child under two statutory definitions of the term.  First, because K.S. was allegedly "abandoned" by her parents under R.C. 2151.03(A)(1), and second, because she lacked "adequate parental care because of the faults or habits of" her parents under R.C. 2151.03(A)(2).  *Id.* at 1-2.  In addition, FCCS alleged that K.S. was a dependent child under R.C. 2151.04(C) because her "condition or environment" warranted the state assuming guardianship of K.S.  *Id.* at 2.  Eight days after FCCS filed the complaint, the trial court awarded the agency temporary custody of K.S.  (Nov. 12, 2019 Mag.'s Order.)

{¶ 3}   In exchange for dismissing the allegations of neglect, J.S. and D.S. agreed to not contest the adjudication of K.S. as a dependent child.  (Jan. 29, 2020 Jgmt. Entry & Mag.'s Decision.)  At a dispositional hearing on the dependency adjudication, the trial court ordered temporary court custody to FCCS of K.S. under R.C. 2151.353(A)(2) and approved and adopted the agency's case plan for reunification.  (Feb. 11, 2020 Jgmt. Entry & Mag.'s Decision.)

{¶ 4}   On October 7, 2020, FCCS filed a motion to extend temporary court custody. FCCS stated that although it had first placed K.S. with her older sister, the placement was "disrupted due to the parents engaging in harassment, which caused concerns for safety." (Oct. 7, 2020 FCCS Mot. at 2.)  Consequently, FCCS moved K.S. to a foster home and she "reported that she wants to reunify with her parents."  *Id.*  FCCS acknowledged that J.S. had "made some case plan progress," including "attend[ing] the majority" of K.S.'s appointments.  *Id.* at 2-3.  However, out of 15 required drug screens, J.S. had tested positive in the only completed screen.  *Id.* at 3.  According to FCCS, J.S. needed "to complete parenting education, provide documentation or engage in drug treatment and mental

health treatment, establish stable housing and participate in monthly home visits, and consistently submit for drug screens." *Id.* FCCS reported similar circumstances and requirements for D.S., who had tested positive in the only drug screen completed out of 17 required screens. *Id.* The agency requested an extension of temporary custody because both parents needed "additional time to complete case plan objectives and show that they can provide the child with a permanent, stable home." *Id.* The trial court granted the motion and extended temporary court custody on November 9, 2020. (Nov. 16, 2020 Jgmt. Entry & Mag.'s Decision.)

{¶ 5} On July 9, 2021, FCCS filed a motion for permanent custody under R.C. 2151.414(D).[1] According to the agency, both parents had "failed to complete case plan services." (July 9, 2021 FCCS Mot. for Permanent Custody at 5.) They had "not completed parenting classes" and both were still homeless. *Id.* "Despite numerous referrals for services to assist, Mother and Father have failed to secure independent and stable housing." *Id.* at 6. They had "inconsistently provided drug screens," with recent positive tests for methamphetamines and amphetamines. *Id.* at 5. J.S. had been "diagnosed with bipolar disorder and schizophrenia," but it was "unknown if she is taking medication to manage" those disorders. *Id.* FCCS also stated that J.S. and D.S. had been "extremely uncooperative with the agency and refuse[d] to engage in case plan services." *Id.* at 6. Because they "would frequently threaten and harass the kinship providers" where K.S. had first been placed, the agency had to remove her to foster care. *Id.* at 6-7. In the agency's estimation, J.S. and D.S. had "not made significant progress in reaching their case plan goals or alleviating or mitigating the problems that initially resulted in the child's removal" and were unlikely to do so. *Id.* at 7. Accordingly, the agency asked the trial court to grant its motion for permanent custody. *Id.*

{¶ 6} The trial court held trial on February 1, 2, and 7, 2022. FCCS first called D.H., the foster parent of K.S., as a witness. She testified that K.S. had been in her care since December 5, 2019. (Feb. 1, 2022 Tr. at 38.) Apart from two cats, she and K.S. were "the

---

[1] An initial motion for permanent custody was filed on March 25, 2021, but the trial court dismissed it at the request of FCCS on the first day of trial. (Feb. 1, 2022 Tr. at 30-31; Mar. 2, 2022 Decision & Jgmt. Entry at 4.)

only two" in the household. *Id.* at 39. D.H. described their relationship as "very good." *Id.* at 40. She elaborated:

> We have a friendly relationship, but we are not friends. She's - - She's [] very well-behaved. And I'm pretty strict as a foster parent/guardian, and she respects that, but we, you know, we laugh a lot. We do a lot of just travel and fun things together, but it's very much - - She's the child and I'm kind of guiding her as far as what I believe is best for her.

*Id.* at 40-41.

{¶ 7} D.H. testified that "the biggest change" in K.S. since she had come to live with her was her confidence level. *Id.* at 41. D.H. "really wanted her to focus on schooling and we read together because her reading was very much below where it should be." *Id.* Over time, K.S. resisted D.H.'s guidance less, to the extent that she described K.S. as "doing very, very well in school, which she hadn't really before, so that was new to her." *Id.* at 41-42. K.S. was also "involved in a lot of different activities [and] meeting different people." *Id.* at 42. Before living with D.H., K.S. had been "failing every subject" in school and reading at a second-grade level. *Id.* at 42-43. At the time of trial, she was "basically on level with everything she should be at" and her reading had improved to at least a seventh-grade level. *Id.* Activities K.S. participated in included volleyball, cheerleading, and helping with an afterschool play or musical. *Id.* at 43.

{¶ 8} D.H. testified that at the beginning of the placement, her relationship with K.S.'s parents "started out very, very positive" because all parties desired reunification. *Id.* at 44. However, since K.S. had begun to be honest about not wanting to go back to her parents, things "got very strained" and the parties "haven't had much of relationship since." *Id.* D.H. testified that she and K.S. had "never missed any" visits with J.S. and D.S., with the exception of two permitted absences for a vacation that were later made up. *Id.* at 45. During the summer of 2021, however, K.S. "started saying that she didn't want to go" to parental visits. *Id.* D.H. testified that if FCCS obtained permanent custody of K.S., she would be interested in adopting her. *Id.* at 48. She also stated that adoption "would never mean cutting off" a relationship with J.S. and D.S. for K.S., if she "wishes, and if it's a safe relationship." *Id.*

{¶ 9}   D.H. also testified that in August of 2021, J.S. had threatened to "beat down the door" of her house in a text message, causing her to file a police report. *Id.* at 52.  When asked to elaborate on the contexts of the text message, D.H. recalled it as follows: "You fucking bitch.  We know where you live.  You and your nasty five-bedroom home.  We're going to come. And you think we don't know where you live.  We're going to come and get you.  * * * And then she sent a screen shot of my address."  *Id.* at 101.

{¶ 10} D.S., K.S.'s father, testified that he believed that FCCS had removed her because of truancy and "a lack of communication."  *Id.* at 125.  He could not remember the allegations stated in the complaint that led to her removal.  *Id.* at 126.  He stated that he "[s]omewhat" remembered the case plan.  *Id.* at 127.  "I looked it over."  *Id.*  He stated that he had received drug treatment and suboxone drug replacement therapy and counseling sometime in late 2019.  *Id.* at 132-33.  D.S. admitted that he did not do an alcohol assessment for the FCCS caseworker, but claimed to have done a drug assessment.  *Id.* at 134.  He testified that he had begun treatment at another facility after the assessment, but could not remember dates.  *Id.* at 135-36.  He stated that he was receiving ongoing treatment and receiving weekly disbursements of suboxone, as he was primarily a user of opioids.  *Id.* at 142, 145.  He stated that he had been sober for approximately six months.  *Id.* at 144.

{¶ 11} D.S. testified that he did not tell the FCCS caseworker where he was getting treatment, saying that he "never talked to her."  *Id.* at 138-39.  He disagreed that he had refused to sign a release so that the caseworker could obtain his drug treatment records.  *Id.* at 139.  D.S. did not participate in the random drug screens required by FCCS and the case plan and instead went for scheduled weekly drug screens at his treatment provider.  *Id.* at 149-50.  When asked, he could not state the number of tests that had returned positive. *Id.* at 150.

{¶ 12} D.S. stated that he and J.S. had been living with his mother and father for over a year and had been living there at the time FCCS removed K.S. from their care.  *Id.* at 150-51.  However, he later testified that they had actually been living in a hotel most of the time and only moved back to his parents' house about two weeks before trial.  *Id.* at 158-59. Although the house only had two bedrooms, D.S. testified that if K.S. came to live with them, he and J.S. would give up their room for her and stay in the basement.  *Id.* at 153.  He

gave his mother "about fifty bucks" a month for utilities and paid about six hundred dollars a month for groceries. *Id.* at 154.

{¶ 13} D.S. testified that he currently worked as an independent contractor for a roadside assistance company and earned about $3,600 in a "good month." *Id.* at 154-56. Although the case plan required D.S. to submit evidence of his income, he had never provided the caseworker with 1099s because she "never asked." *Id.* at 157. In spite of having this income, D.S. testified that he was "having a little bit of trouble finding" independent housing. *Id.* at 158.

{¶ 14} D.S. testified that he had completed an online parenting class in 2019 and informed the caseworker about it. *Id.* at 163-64. He testified that he had never undergone a mental health assessment. *Id.* at 165-66. He described visits with K.S. as "[b]asically, just sitting there playing games on the phone with [her]," while at times they would "color and watch her dance." *Id.* at 167-68. D.S. believed that K.S. had become "mad" and stopped wanting to attend visits because he had "said something about her shorts." *Id.* at 169. "That was my opinion, yes. Because after I said something, that's when they stopped." *Id.* D.S. admitted that he had not attended any of K.S.'s medical or educational appointments during the case. *Id.* at 172. He stated that in his "opinion," he had not completed the case plan. *Id.* at 173.

{¶ 15} K.S.'s mother, J.S., testified that she and D.S. had been married for 15 years. *Id.* at 195. She testified that she and D.S. had been living with his parents for the last two weeks after living in a hotel for a year. *Id.* at 201. At the time of trial, J.S. was not employed, although she stated that she owned a cleaning business that had generated income before the pandemic. *Id.* at 202-04. J.S. described the home of D.S.'s parents where they currently lived as "fit for my daughter." *Id.* at 206.

{¶ 16} J.S. stated that she had completed the case plan requirements of alcohol and drug assessment and mental health assessment and had been in treatment "[f]or a couple years." *Id.* at 207. When asked what the result of the alcohol and drug assessment was, she replied: "I have no clue." *Id.* She reported that she was given no mental health diagnosis. *Id.* at 208. J.S. stated that she has a doctor's visit to receive suboxone once a week, sees a counselor the same day, and also participates in pre-scheduled drug screen. *Id.* at 210. She could not recall the results of any of those screens or of any non-scheduled drug screens she

had been asked to take. *Id.* at 213-24. She stated that she was not currently taking any drugs and that if any screen returned positive, it would be because of the suboxone she was taking. *Id.* at 214-15. When shown several positive test results, J.S. replied that they were because of the suboxone in her system and stated that she had not taken methamphetamine since 2018. *Id.* at 217-19. She also stated that the last time she had taken an opiate was 2017 and that she had never used alcohol. *Id.* at 220.

{¶ 17} J.S. testified that the last time she had a visit with K.S. was in the summer of 2021. *Id.* at 228. Like D.S., she believed that the reason that K.S. did not want to continue visits with them was because of a comment he made "to her about her shorts because they were too short, and it made her mad." *Id.* at 229. She described the regular visits with K.S. before they stopped: "We used to talk, we used to go shopping, she would play games on her phone and watch videos on it." *Id.* at 235.

{¶ 18} J.S. admitted sending the threatening text message to D.H., explaining that she "was upset." *Id.* at 237. J.S. admitted that she had not completed the case plan. (Feb. 2, 2022 Tr. at 22.) However, she believed that the only thing left to complete was obtaining housing. *Id.* Five months before trial, J.S. texted the caseworker and told her not to contact her after the caseworker accused her of "playing games." *Id.* at 52.

{¶ 19} On cross-examination, J.S. admitted that she had agreed to terminate her parental rights regarding another minor child "due to medical issues" that she said made her "[un]able to take care of [the child]." *Id.* at 29.

{¶ 20} During trial, the trial court informed the parties that K.S. had expressed her wishes during an in-camera conference with her attorney and the guardian ad litem present. K.S. felt that she had "given her parents enough time and they can't get it together." (Feb. 1, 2022 Tr. at 190.) K.S. was "wanting to be adopted and move on," and, according to the trial court, "didn't equivocate * * * [or] go back and forth" on the issue. *Id.* at 190-91.

{¶ 21} FCCS caseworker Tomika Berry, testified that, as with "all" cases she works on, family reunification was the goal for the family. (Feb. 2, 2022 Tr. at 70-71.) She was the third caseworker to work with the family and was assigned in June of 2021. *Id.* at 72-73. She noted that the first caseworker did not initially request that K.S. be removed when filing the complaint, which was prompted by "truancy concerns, alcohol and drug [issues], and neglect." *Id.* at 79. However, noncompliance with the caseworker's requests "to see

the child to ensure that she was safe and that * * * she was going to school" and to meet with the parents led to "concerns" resulting in removal.  *Id.* at 80-81.

{¶ 22} Ms. Berry stated that after K.S.'s removal on November 12, 2019, she was initially placed with her older sister.  *Id.* at 85-87.  However, the sister "reported to the agency that [J.S.] and [D.S.] were stalking and following them and she did not feel safe with continuing to have [K.S.] in placement with her."  *Id.* at 87.  After leaving the placement with her sister, K.S. went to stay with D.H.  *Id.* at 90.

{¶ 23} Ms. Berry reported described her own relationship with J.S. and D.S. as "[n]ot very productive, very aggressive from day one."  *Id.* at 96.  FCCS records reflected strained relationships with the previous two caseworkers.  *Id.* at 97.  Thus, Ms. Berry stated that she "explained to them what my role was, that I was not their previous caseworkers and I was there to give them the resources that they needed to complete their case plan so that they [could] try to regain custody of [K.S.]."  *Id.* at 96.  Nevertheless, J.S. and D.S. called her a liar, a racist, and threatened to sue her.  *Id.* at 96-97.

{¶ 24} Ms. Berry testified that she had gone over the case plan requirements with J.S. and D.S. at least once in person and "several times" over the phone.  *Id.* at 94.  Phone calls and texts are the primary means of communicating with parents who "are homeless or don't have an address" because the impossibility of a home visit.  *Id.* at 95.  Ms. Berry stated that she had routinely texted with J.S. and described a caseworker's obligation to contact parents monthly.  *Id.* at 95-97.  However, contact with J.S. ended in October of 2021 when J.S. told Ms. Berry "to stop calling her phone" and that she was going to block her number.  *Id.* at 98.

{¶ 25} According to Ms. Berry, J.S.'s case plan requirements were "mental health assessment and to follow all recommendations if there were recommendations; an [alcohol and drug] assessment and to follow all recommendations if there were recommendations; parenting classes; to link with Family-to-Family, which was for housing; to complete drug screens; and typical, stable housing, income in order to show that [they could] take care of the child."  *Id.* at 103-04.  Other obligations included attending K.S.'s "medical and developmental appointments," being available for monthly visits, and signing all releases necessary for FCCS to obtain records.  *Id.* at 105-06.  Ms. Berry's summary of D.S.'s case plan requirements mirrored those applicable to J.S.  *Id.* at 106.

{¶ 26} Ms. Berry stated that FCCS had "no record of an alcohol and drug assessment" for J.S. *Id.* at 107. However, she had eventually signed a release for her records after initially refusing to do so, and Ms. Berry recounted that she therefore had "updated records" pertaining to J.S.'s substance abuse treatment. *Id.* at 108. Nevertheless, the records indicated that J.S. was "still testing positive for drugs, for methamphetamine's and amphetamines" in spite of the treatment. *Id.* at 109. J.S. had only provided two random drug screens to FCCS during the pendency of the case and both were positive. *Id.* at 110-11. Ms. Berry also testified that all of the scheduled screens from the drug treatment provider were positive for not only suboxone, but additionally for methamphetamine and amphetamines. *Id.* at 111. Ms. Berry clarified that tests indicating suboxone were not considered positive, but none of J.S.'s drug screens were negative and only contained suboxone. *Id.* at 113-14. While acknowledging that J.S. had entered treatment as required by the case plan, Ms. Berry did not believe that she had made sufficient progress in treatment to find that she had complied with the substance abuse requirements of the case plan. *Id.* at 116. After two years, "still using the same drug * * * does not show progress." *Id.* at 117.

{¶ 27} Ms. Berry stated that FCCS did not have an alcohol and drug assessment on file for D.S. but acknowledged that he was receiving treatment at the time the case opened and "was prescribed suboxone." *Id.* at 117. J.S. reported to Ms. Berry that D.S. subsequently was treated at the facility where she received treatment, but Ms. Berry was unable to obtain any treatment records from the facility because D.S. never signed a release allowing her to obtain them. *Id.* at 119-20. She only had one drug screen for D.S., from 2019, and it returned "positive for methamphetamine and suboxone." *Id.* at 120-21. Ms. Berry did not believe that D.S. was compliant with the case plan's substance abuse requirements. *Id.* at 121.

{¶ 28} With regard to housing, Ms. Berry stated that she had only learned that the couple were living with D.S.'s parents the day before in court. *Id.* at 125. Neither parent had informed her that they had moved. *Id.* If she had been aware, Ms. Berry "would have done a walk through to make sure it's safe" for K.S. *Id.* at 126. FCCS had first referred them to housing services 20 months before trial. *Id.* Activity logs showed that the housing liaison

had repeatedly attempted to contact J.S. and D.S., but "they were not responsive" and "they did not follow through with the leads that she gave them." *Id.* at 128-29.

{¶ 29} Ms. Berry testified that she never received any income verification or pay stubs from J.S. or D.S., in spite of repeated requests, and that D.S. expressly refused to provide his. *Id.* at 132-33. The parents had attended one of K.S.'s medical appointments "earlier on in the case" and had never again asked about her school or medical appointments. *Id.* at 135. Ms. Berry believed that both parents could have benefited from receiving mental health services. *Id.* at 145.

{¶ 30} Ms. Berry agreed that up until the date that visits stopped, J.S. and D.S. had been "fairly consistent to extremely consistent" in attending visitation with K.S. *Id.* at 148. Based on her observations, she described the visits as "passive." *Id.* at 149. "Everyone is on their phones, there's not that much talking going on." *Id.* Often they would order food and eat as well. *Id.* After K.S. had expressed her wish to be adopted by D.H. but before she decided to stop going to visits, their visits became "uncomfortable" and "tense." *Id.* at 151. K.S. reported to Ms. Berry "that she just did not want to do visits anymore, that her parents were blaming her for the [permanent custody] trial and she did not want to be at the visits anymore; they were making her feel uncomfortable." *Id.* at 155. After the visits stopped in July of 2021 Ms. Berry encouraged K.S. to "at least start a phone conversation" with them, "to start talking to them to move forward with visits," but K.S. would refuse. *Id.* In Ms. Berry's estimation, D.H. had gone "above" the typical as a foster parent in trying to encourage visits between K.S. and her parents. *Id.* at 161.

{¶ 31} Ms. Berry testified that at a July 1, 2021 visit, she had observed a bond between J.S. and K.S., but couldn't say that she "personally saw a bond" between K.S. and D.S. *Id.* at 162. She described K.S. as neither happy nor sad when the visit ended. *Id.* at 165. Ms. Berry described the relationship between K.S. and her foster mother, D.H., as "a very close relationship." *Id.* at 166. K.S. appeared "happy" there and "does what is asked of her in the home." *Id.* In addition, Ms. Berry reported that K.S. was doing well in school and "likes school." *Id.* at 167. K.S. was doing "much better" than in the first placement. Ms. Berry stated that K.S. "is happy, she's thriving, she is more expressive than even from the first time I became her caseworker until now. She expresses her feelings. She's doing things that she's never done before. She's traveling; she's cheering; she's playing volleyball;

she's reading more and better; * * * she's just all around good kid and she's happy." *Id.* at 171.

**{¶ 32}** According to Ms. Berry, K.S. had expressed to her at "every visit" that she wished for legally secure, permanent placement. *Id.* at 169. Ms. Berry was clear that she believed that K.S. "loves her parents. I don't think this has anything to do with love or not, I just think she wants some stability in her life and she just wants to move on from being involved with Children Services and this life." *Id.* at 170. Ms. Berry recommended that the trial court grant the motion for permanent custody, as she believed it was in K.S.'s best interest. *Id.*

**{¶ 33}** Jinx Beachler testified that she was appointed K.S.'s guardian ad litem on November 12, 2019. (Feb. 7, 2022 Tr. at 7.) Ms. Beachler stated that she was "in regular communication" with D.H., K.S.'s foster mother. *Id.* at 13. In her opinion, D.H. "really wanted to try to reunite the parents with the child," paid for meals for the parents on Mother's Day and Father's Day early on in the placement, and "wanted what was best for the child and was not trying to interfere" with their relationship. *Id.* at 14. She noted that D.H. was paying to send K.S. to a Catholic school and "trying to show the child values and goals" during the placement. *Id.* According to Ms. Beachler, D.H. had been instrumental in getting K.S. accepted into a Catholic high school for the upcoming school year. *Id.* D.H. took K.S. on "educational trips" and was providing a "wonderful basis" for a flourishing social environment. *Id.* at 16. In contrast, "the phone was the parent for the child while she was living with her mother and father because she wasn't getting any social interaction that was appropriate," Ms. Beachler opined. *Id.* at 16-17.

**{¶ 34}** She noted that K.S. "had a very unstable childhood" and "wasn't going to school" when living with her parents. *Id.* at 19. She noted that even before the involvement of FCCS, K.S. stayed with her paternal grandmother "at times," but she "kicked out [K.S.] in the middle of the night for the parents to pick her up." *Id.* at 18-19. Ms. Beachler described K.S. as "struggling now to make up for all those formative years of not going to school," but nevertheless described K.S. as "mature beyond her age" with a goal of becoming a veterinarian. *Id.* at 19. In Ms. Beachler's opinion, K.S. was "highly intelligent and I believe she's going to make it." *Id.*

{¶ 35} Ms. Beachler testified that she had "minimum interaction" with J.S. and D.S. *Id.* at 20. She saw them at several court appearances and at two visitations, one of which Ms. Beachler supervised. *Id.* She was unable to interview them because "they were a moving target, moving from hotel to hotel," and then once represented by counsel, she only "talked to counsel." *Id.* At that point, Ms. Beachler repeatedly emailed counsel to obtain releases for records but was unsuccessful. *Id.* She believed that she did her "due diligence" in such attempts. *Id.* at 21. On cross-examination, she was pressed to explain why she did not visit the parents. Ms. Beachler explained that not only did she not "know exactly where they were at" because of their lack of housing, she "would not be comfortable going out to any location" because of "their behavior" threatening others, including an initial caseworker. *Id.* at 41.

{¶ 36} Ms. Beachler described the visitations she observed as containing "minimum interaction between the parents" and K.S. *Id.* at 23. All three of them "were just looking at their phones" during the visits. *Id.* She described the interaction as "very sterile" and even "bizarre," stating: "I did not view [that] it was appropriate interaction." *Id.* at 24-25.

{¶ 37} Ms. Beachler stated that K.S. "for a period of time wanted to go home. She wanted her parents to succeed and make it [but] she came to a point in that she realized that they were not going to [succeed]." *Id.* at 32. Ms. Beachler felt "sorry for these parents," but stated: "they're just not capable. They were given opportunities to do what they're supposed to do," but K.S. "realizes that she cannot wait any longer for her parents to try and do the case plan." *Id.* at 32-33. Ms. Beachler reported that K.S. "now wants termination of parent[al] rights; she wants to be adopted out; she wants to get on with her life. And I'm really sorry for the parents because I know that they love their child, but this is [the] reality of the situation." *Id.* at 33. When asked about K.S.'s competency, Ms. Beachler replied that K.S. was "totally competent and she knows exactly what's going on." *Id.* at 34. In Ms. Beachler's opinion, termination of parental rights was in K.S.'s best interest. *Id.*

{¶ 38} On March 2, 2022, the trial court granted the motion for permanent custody, terminated J.S. and D.S.'s parental rights, and committed custody of K.S. to FCCS. J.S. and D.S. have both appealed. J.S. asserts a single assignment of error:

The permanent custody entry is not supported by the weight of the evidence.

{¶ 39} D.S. asserts the following two assignments of error:

[I.] The court committed reversable error when it terminated the parental rights of D.S. because the decision was against the manifest weight of the evidence.

[II.] The trial court plainly erred when it failed to comply with R.C. 2151.281(D) and (I) given the noncompliance with the duties of the guardian ad litem.

## II. Standard of Review

{¶ 40} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. Under the manifest weight of the evidence standard, the court of appeals "will not overturn a permanent custody order when it is supported by competent, credible evidence." *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 51. The reviewing court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13.

## III. Analysis

{¶ 41} Because appellants raise the same challenge to the trial court's decision granting the motion for permanent custody, we will consider their arguments in tandem while reviewing the decision.

### A. First Assignment of Error

{¶ 42} R.C. 2151.414 governs the determination of an agency's motion for permanent custody of a child. "Before granting permanent custody, a trial court must make two determinations by clear and convincing evidence." *C.W.* at ¶ 54. First, the trial court must determine whether one of the five factors under R.C. 2151.414(B)(1) applies. *Id.*

{¶ 43} Here, the trial concluded that "clear and convincing evidence" demonstrated two of the R.C. 2151.414(B)(1) factors. The evidence showed both that K.S. could not "be

placed with either of the child's parents within a reasonable time or should not be placed with the child's parents," as required by R.C. 2151.414(B)(1)(a), and that she had "been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period," as required by R.C. 2151.414(B)(1)(d). (Mar. 2, 2022 Decision & Jgmt. Entry at 6.) Neither appellant challenges the trial court's findings on the R.C. 2151.414(B)(1) factors. (Brief of D.S. at 11; Brief of J.S. at 40.)

{¶ 44} Rather, appellants challenge the second part of the trial court's R.C. 2151.414(B)(1) determination. Under the statute, "clear and convincing evidence" must show "that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." R.C. 2151.414(B)(1). The analysis is guided by any of the "relevant factors" set forth in R.C. 2151.414(D)(1). Appellants' arguments center on the trial court's findings on those factors that led it to conclude that termination of their parental rights was in the best interest of K.S.

{¶ 45} The statute first asks the trial court to consider "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). The trial court devoted nearly four pages of discussion to this factor alone, recounting in detail how those relationships changed over the timespan of the case. Foster mother D.H. went from feeling that she was "in way over [her] head" with her first foster child to taking the child on trips and paying out of her own pocket for K.S.'s school tuition. (Mar. 2, 2022 Decision & Jgmt. Entry at 15.) K.S. wanted "very much to return to her parents" at the beginning of the case and "was not invested in a relationship" with her foster mother. *Id.* at 16. However, over the course of 18 months or so, K.S. began to change her mind about returning. The trial court observed a number of factors that contributed to this change, including K.S.'s increasing frustration at appellants' inability to procure permanent housing, "especially when" she observed J.S. spending large sums of money on gifts or shopping. *Id.* The trial court also discussed the deterioration in K.S.'s relationship with J.S., who "became angry and aggressive" when told of K.S.'s wishes and threatened the foster mother. *Id.* at 17.

{¶ 46} D.S. argues that the trial court "made no finding" that the bond between K.S. and her foster mother "was greater than the bonds to her parents," and that because bonds between K.S., J.S., and D.S. "still exist," it was improper for the trial court to weigh this factor "against reunification." (Brief of D.S. at 12.) K.S. does not make a specific assertion of error in the trial court's analysis of this factor other than to explain that her parental bond may have appeared less than what it was because she "was not comfortable with a lot of hugging in front of strangers" during visitation. (Brief of J.S. at 41.)

{¶ 47} D.S.'s assertion that the trial court made no finding on the bonds between the parties does not accurately reflect the language of the decision. The trial court noted that both the caseworker and guardian ad litem "concluded that [K.S.] is very bonded to her foster mother and now less bonded to her biological parents, but obviously knows them well and loves them. The Court finds that [K.S.] is strongly bonded to her foster mother. The caseworker stated that she was bonded with her parents, but the bond became less over the length of the case." (Mar. 2, 2022 Decision & Jgmt. Entry at 18.) Read in context, it is apparent that the trial court agreed with the testimony of the caseworker and guardian ad litem regarding the relative strength of the parties' bonds, which, by the end of trial, had strengthened between K.S. and her foster mother. The manifest weight of the evidence, including the testimony of all parties, supports the trial court's findings on the R.C. 2151.414(D)(1)(a) factor.

{¶ 48} Next, the statute asks the trial court to consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). K.S. "was unwavering in her decision to be adopted," the trial court found. (Mar. 2, 2022 Decision & Jgmt. Entry at 18.) "She believes [appellants] are still using even though they deny it, and that they cannot take care of her. [K.S.] wants stability and is 'tired of the drama.' " *Id.* at 18-19. The "drama" that K.S. described to the trial court included the "threatening messages" to her foster mother and J.S. telling her that D.S. had a stroke and blaming K.S. for it. *Id.* at 19. The trial court further noted that K.S. had "directly expressed to the Court, the caseworker, the foster mother, and her parents that she wishes to be adopted by her foster mother. She wishes to have no contact with her parents currently." *Id.*

{¶ 49} J.S. admits that K.S.'s "wishes * * * were clearly to move forward with adoption." (Brief of J.S. at 42.) She asserts that these wishes were "based on K.S.'s conclusion that her parents were taking too long" to secure housing. *Id*. While the trial court did acknowledge K.S.'s frustration with appellants' inability to obtain housing in other parts of its decision, that fact did not form part of its discussion of K.S.'s wishes when considering R.C. 2151.414(D)(1)(b). Rather, appellants' inability to care for her or address their substance abuse, as well as attempts to sabotage K.S.'s positive relationship with her foster mother were the specific factors mentioned by the trial court when discussing this factor.

{¶ 50} While J.S. at least acknowledges the reality of K.S.'s wishes, D.S. discounts them entirely. He argues that "[b]ecause K.S. remains bonded with her parents and because of the potential influence D.H. or the caseworker may have had on this decision, it was improper to find [that] this factor weighs against re-unification." (Brief of D.S. at 13.) D.S. cites no evidence in the record to support the contention that the caseworker or foster mother tried to "influence" K.S. in any way. In fact, the evidence suggests otherwise. D.H. testified: "I think it's very important that she has a relationship with them. That I don't want her to hold it against me later on and think that I've done anything, so I'm just constantly saying, you know, this is your family. This does matter." (Feb. 1, 2022 Tr. at 70.) D.H. encouraged K.S. "to be honest" with appellants: "Tell them how you're feeling." *Id*. at 73. The following exchange is illustrative:

> Q. So, did you try to do anything to prevent the child from reuniting with her parents?
>
> A. Absolutely not.
>
> Q. Even though you are a potential adoptive parent, did you continue to try to reunite that child with her parents?
>
> A. Yes.

*Id*. at 106.

{¶ 51} Furthermore, Ms. Berry testified that she encouraged K.S. to "at least start a phone conversation" with J.S. and D.S. after visits had stopped in the hopes that K.S. would "start talking to them to move forward with visits." (Feb. 2, 2022 Tr. at 155.) There is no

evidence that either the guardian ad litem or caseworker attempted to influence K.S. in a manner other than to encourage her to have a relationship with her parents.

{¶ 52} Given K.S.'s age and maturity level, the trial court did not err in its consideration of R.C. 2151.414(D)(1)(b) when listening to K.S.'s clearly expressed wishes and weighing them in its decision to grant the motion for permanent custody.

{¶ 53} The trial court also considered "[t]he custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period," as stated under R.C. 2151.414(D)(1)(c). Clear and convincing evidence demonstrated that this factor was met because K.S. had been in the custody of FCCS "beginning November 12, 2019 until the present, for twelve months or more of a twenty-two month period." (Mar. 2, 2022 Decision & Jgmt. Entry at 19.) Neither appellant challenges the trial court's finding under R.C. 2151.414(D)(1)(c).

{¶ 54} The fourth factor considered by the trial court was "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). The trial court began its discussion by referencing R.C. 2151.414(E), which states that "whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence." In addition, the trial court acknowledged the statutory requirement under R.C. 2151.414(E) that it was required to "enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" if it determined, by clear and convincing evidence, that any of the factors under R.C. 2151.414(E)(1) through (16) were met.

{¶ 55} The trial court pointed out that "[b]y the time of trial, parents had more than two years to complete their case plan and use resources offered to address substance abuse, housing, and mental health issues." (Mar. 2, 2022 Decision & Jgmt. Entry at 20.) Nevertheless, appellants had "failed to complete the case plan." *Id.* They had not "obtained independent stable housing or obtained and maintained verifiable employment or provided consistent negative drug screens." *Id.* Although the trial court believed that D.S. was employed, he had provided no documentation of his income. The trial court found J.S.'s

testimony regarding her employment to be "inconsistent." *Id.* Like D.S., she had failed to offer any documentary evidence to support her assertions regarding income. *Id.* The trial court did not find J.S. "credible on many issues," including her drug use. *Id.* at 22. For both parties, there were "ongoing concerns of drug use." *Id.* The trial court concluded that neither party could "safely assume custody" of K.S. and that the "only feasible path to permanency" was to grant the motion for permanent custody. *Id.*

{¶ 56} D.S. counters with references to his own testimony regarding employment and his own testimonial assertions that he "provided several clean drug screens" and had "been sober for several months." (Brief of D.S. at 15.) Although the trial court acknowledged that D.S. and J.S. were receiving suboxone treatment, the only documentary evidence of drug screens in the record were positive. The trial court did not err by failing to credit either appellants' repeated testimonial assertions that their nonrandomized drug screens, none of which were provided to FCCS, were negative.

{¶ 57} D.S. also argues that the trial court "improperly found that a child was previously removed" from his care. (Brief of D.S. at 17.) He states out that "[n]o exhibit was filed to establish what did in fact happen in that case." *Id.* D.S. also points out the trial court contradicts this finding by stating, at the conclusion of its R.C. 2151.414(D) best interest analysis, that "no evidence was presented" regarding R.C. 2151.414(E)(7) through (11). *Id.*

{¶ 58} One of the R.C. 2151.414(E) factors that requires a finding that the child cannot be placed with either parent is R.C. 2151.414(E)(11), which applies when "[t]he parent has had parental rights involuntarily terminated with respect to a sibling of the child * * * and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." The trial court discussed this factor in its initial R.C. 2151.414(B)(1)(a) discussion when found clear and convincing evidence to support a number of the R.C. 2151.414(E) factors. Regarding R.C. 2151.414(E)(11), the trial court found: "Testimony established that a sibling of [K.S.] has been placed * * * after being permanently committed to FCCS," with reference to the case number of that proceeding. (Mar. 2, 2022 Decision & Jgmt. Entry at 12.) "The Court finds that this factor does apply and has been proven in regard to both parents." *Id.*

{¶ 59} Although D.S. asserts that there was no evidence to support this finding, J.S. concedes the fact of this removal. Her briefing states that "the court rightly found the existence of a factor from division (E) of R.C. 2151.414, that the parents previously had rights terminated as to another child." (Brief of J.S. at 44.) Given this concession, we cannot agree with D.S. that there was no basis for the trial court's finding. Finally, what D.S. believes is a contradiction in the trial court's reasoning is more likely non-reliance on that finding. The final best interest factor mentioned by the trial court, R.C. 2151.414(D)(1)(e), asks "[w]hether any of the factors in divisions (E)(7) to (11) * * * apply in relation to the parents and child." In the context of the best interest analysis, it did not mention the R.C. 2151.414(E)(11) finding it had earlier made, and instead stated that there was "no evidence" to support a finding under R.C. 2151.414(D)(1)(e). In other words, the trial court did not further rely on this factor when determining K.S.'s best interest. D.S. was not prejudiced by the trial court's failure to hold a prior termination of parental rights against him when it had the opportunity to do so but did not.

{¶ 60} J.S. asserts that she and D.S. "were ready to provide K.S. with a secure permanent home" and they had "largely completed their case plan." *Id.* at 42. However, the trial court found otherwise, by clear and convincing evidence. The trial court noted that they had two years to procure housing and to complete the case plan but failed to do so.

{¶ 61} J.S. also asserts that the trial court incorrectly found that a best interest determination was mandatory under R.C. 2151.414(D)(2), which the trial court ruled applied in addition to its discretionary best interest finding under R.C. 2151.414(D)(1). R.C. 2151.414(D)(2) states that a trial court "shall commit the child to the permanent custody of a public children services agency" if four listed factors are met. J.S. only challenges the first factor, which applies when "the child cannot be placed with either parent within a reasonable time or should not be placed with either parent" after determining that any of the R.C. 2151.414(E) factors are met. Again, her assertion that "K.S. could be returned with[in] a reasonable time" depends on assertions contradicted by the trial court's findings, including that she and D.S. had "largely completed their case plan" and had "suitable housing arranged." *Id.* at 44. The trial court found otherwise, and neither appellant has demonstrated that these findings did not rely on competent, credible evidence. Accordingly, we conclude that the manifest weight of the evidence supported the

trial court's decision to grant the motion for permanent custody. D.S.'s first and J.S.'s sole assignment of error is overruled.

## B. Second Assignment of Error

{¶ 62} D.S. presents an additional assignment of error. He asserts that the trial court erred by failing to comply with R.C. 2151.281(D) and (I), which govern the responsibilities of a guardian ad litem. In addition to these statutes, D.S. argues that the guardian ad litem failed to comply with Rule 48.03 of the Rules of Superintendence of the Ohio Supreme Court, which sets forth the general responsibilities of a guardian ad litem. (Brief of D.S. at 22.) He alleges number of perceived deficiencies in the guardian ad litem's performance, such that she "failed to become informed about the facts of the case" by failing to contact him, failing to communicate her concerns about D.S. to his attorney, relying on the caseworker for information instead of independently obtaining it or investigating it, and failing to visit D.S. and J.S. *Id.* at 24-30.

{¶ 63} R.C. 2151.281(D) states: "The court shall require the guardian ad litem to faithfully discharge the guardian ad litem's duties and, upon the guardian ad litem's failure to faithfully discharge the guardian ad litem's duties, shall discharge the guardian ad litem and appoint another guardian ad litem." Furthermore, R.C. 2151.281(I) provides:

> The guardian ad litem for an alleged or adjudicated abused, neglected, or dependent child shall perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the public children services agency or private child placing agency that has temporary or permanent custody of the child, and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court.

{¶ 64} We note initially that D.S. never objected to the guardian ad litem's performance of her duties in the trial court. Accordingly, appellate review of this issue is limited to plain error, and reversal under that standard "is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error seriously affects the basic fairness, integrity, or public reputation of the judicial process itself."

*Uretsky v. Uretsky*, 1oth Dist. No. 02AP-1011, 2003-Ohio-1455, ¶ 7, citing *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

{¶ 65} Furthermore, "the Rules of Superintendence do not create individual rights." *In re D.E.*, 1oth Dist. No. 20AP-83, 2021-Ohio-524, ¶ 77. *See also In re S.S.*, 17AP-681, 2018-Ohio-1249, ¶ 11 ("the Rules of Superintendence are only internal housekeeping rules that do not create substantive rights in individuals or procedural law, and they do not have the force of law"). Thus, we have consistently rejected attempts to invoke Sup.R. 48 in permanent custody appeals as a basis for recognizing reversible error in a guardian ad litem's actions in the trial court. *See, e.g., In re R.P.*, 1oth Dist. No. 20AP-538, 2021-Ohio-4065 ¶ 31 ("Because Sup.R. 48 is a general guideline that lacks the force of statutory law, noncompliance with Sup.R. 48(D) is not grounds for the automatic exclusion of a guardian ad litem's report, testimony, or recommendation"); *In re B.T.*, 1oth Dist. No. 21AP-485, 2022-Ohio-4093, ¶ 33 (rejecting the "mother's argument that the trial court should have excluded the testimony of the GAL for failure to observe both mother and child together" that was "premised in part on her contention that the GAL failure to comply with Sup.R. 48(D)"). After investigation, the guardian ad litem creates evidence for the trial court to consider in the form of testimony, reports, and recommendations. "As the trier of fact, the trial court may take into account any deficiencies in the guardian ad litem's performance when assigning weight to the guardian's testimony and opinions." *R.P.* at ¶ 31. *See also D.E.* at ¶ 92 ("although in permanent custody proceedings, parents must be afforded every procedural and substantive protection the law allows, the duty of the GAL is to provide the court with information and recommendations regarding the children's best interest"). Here, all of the alleged deficiencies identified by D.S. were brought to the attention of the court during the cross-examination of the guardian ad litem by appellants' attorneys. Thus, the trial court was aware of D.S. criticisms and exercised its discretion when deciding the issue of her credibility, her efficacy as an advocate, and the weight of her recommendations. D.S. has not explained how he was prejudiced by the guardian ad litem's alleged shortcomings, many of which the guardian ad litem defended by pointing to appellants' own behavior. We conclude that the trial court was the proper party to evaluate any such conflict, and that it did not exercise plain error when doing so. The second assignment of error is overruled.

## IV. Conclusion

{¶ 66} Having overruled all appellants' assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BEATTY BLUNT, P.J. and BOGGS, J., concur.

_____